25816, 25863. GEORGIA POWER & LIGHT COMPANY *v.* FRUIT GROWERS EXPRESS COMPANY, and *vice versa.*

Decided February 20, 1937.  Rehearing denied March 18, 1937.

*H. L. McGlothlin, Cook & Harris, Wilson, Bennett & Pedrick,* for plaintiff.

*W. G. Brantley Jr., Memory & Memory,* for defendant.

Guerry, J.  The Georgia Power and Light Company brought suit against the Fruit Growers Express Company, to recover damage for breach of a contract requiring and obligating the defendant to accept and pay for a minimum of 20,000 tons of ice during each year of 1932 and 1933, at a price fixed by the contract. The defendant admitted its failure to accept and pay for such ice, and raised only the issue as to the amount of damage to which the plaintiff was entitled.  By agreement the matter was submitted to an auditor to pass upon all questions of law and fact.  To the report of the auditor both parties filed exceptions of law and exceptions of fact.  The exceptions were heard by the judge without intervention of a jury.  All of the exceptions of the plaintiff, both of law and of fact, were overruled, and the defendant's exceptions were sustained.  The plaintiff assigns error on that ruling.  The defendant took a cross-bill of exceptions.

The contract sued on was made in July, 1926.  Performance was to begin May 1, 1927.  The contract required the plaintiff to build and maintain at Waycross, Georgia, a plant fully equipped with modern appliances for the manufacture, storage, and distribution of ice, according to plans and specifications approved by the Fruit Growers Express Company.  It was to have a daily manufacturing capacity of not less than 150 tons of ice, and a storage capacity of not less than 6000 tons.  The plaintiff was also to construct buildings, runways, machinery, platforms, and other facilities necessary for the loading and handling of such ice, and delivering the same to the defendant in its cars, and was to

load said ice into cars of the defendant at its own expense. The contract further provided that on six months written notice the plaintiff was to enlarge its plant to sufficient size to meet all requirements of the defendant. The defendant agreed to take, each calendar year during the continuation of said contract, which was to run for a period of fifteen years from May 1, 1927, a minimum of 20,000 tons of ice and to pay therefor $3.25 per ton, which payments were to be made during each calendar year. During the calendar year 1932 the defendant accepted and paid for only 9427 tons of ice, and failed and refused to pay for the minimum amount it had agreed to accept and pay for. In 1933 it accepted and paid for 8300 tons, and failed and refused to accept or pay for the minimum number of tons agreed on. The plaintiff sued for the contract price of $3.25 per ton on the ice undelivered, less the cost of manufacture, including labor and materials and services incident to icing and reicing cars in the manner provided in the contract, which amount was alleged and shown to be $1.29 per ton. The aggregate amount sued for was approximately $45,000.

By its answer the defendant denied that plaintiff could have manufactured the undelivered ice at the cost named in the petition, and that any damage resulted to the plaintiff; and alleged that the profits lost by the plaintiff, if any, must be measured by applying to the number of tons of ice the defendant is alleged not to have purchased and received the per ton profit, if any, the plaintiff would have realized had it manufactured and delivered the full amount agreed on under the contract; and that the difference between the total contract price and the complete cost of manufacturing and delivering the entire minimum amount would disclose the net profits. It was further alleged that the contract was an entire and indivisible contract for the purchase and sale, each year throughout its life, of a minimum amount at a fixed price; that the profits lost by the plaintiff in the years 1932 and 1933, if any, must be measured by applying to the number of tons of ice which the defendant failed to accept and pay for in each of said years the per ton profit, if any, that the plaintiff would have realized each year had it manufactured and delivered the ice called for under the contract; that the difference between the total contract price and the complete cost of manufacturing

and delivering the entire twenty thousand tons would disclose the net profits for each year, and such profit could be determined only in that way.

The evidence of the plaintiff showed that the cost of manufacture and delivery to the defendant of the undelivered ice would have amounted to $1.29 per ton, and that no other items of expense would have accrued. It disclosed also the total cost to the plaintiff of the plant, and the operating revenues and the operating expenses. This estimate did not include the cost of manufacture and delivery of the ice and of superintendence, insurance, taxes, maintenance of buildings and grounds, depreciation, etc., because, as the plaintiff contended, such items would not be affected by the manufacture of additional tonnage, and these amounts would not have been changed by the manufacture of the additional tonnage under the contract. The defendant introduced a table of what it termed omitted costs incurred in the carrying on of the business by the plaintiff, which included maintenance of buildings and grounds, superintendence, ice inventory, taxes, insurance, and depreciation, which, if said items were included in the cost of manufacture, would amount to another $1.49 per ton, and contended that said sum and the $1.29 cost of labor, materials, and delivery represented the actual cost of manufacturing the ice, and that the difference between these two sums and the contract price of $3.25 per ton was the damage per ton that plaintiff had suffered. It was shown by the evidence for plaintiff, that these sums of maintenance, taxes, insurance, and depreciation would have been present whether the plant was operated or not.

The question for determination is, what is the proper measure of damages applying to the particular situation? This is the controlling issue. The auditor, whose findings were approved by the court, found that the damage accruing to the plaintiff was the difference between the contract price of the ice not manufactured by the plaintiff or accepted by defendant and the manufacturing costs thereof, and that this manufacturing cost included not only the $1.29 per ton which was the amount which would have been expended by plaintiff in making the ice, but also the proportionate part of the overhead expense listed under the items cited above. The parties were in accord as to the number of tons of ice

accepted and paid for by the defendant during each of the years 1932 and 1933. The Code declares: "Damages are given as compensation for the injury sustained." § 20-1402. "Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach, and such as the parties contemplated when the contract was made, as the probable result of its breach." § 20-1407. In *White & Hamilton Lumber Co.* v. *Lynch,* 159 *Ga.* 283 (125 S. E. 472, 44 A. L. R. 211), it was said that "where there is an anticipatory breach of the contract and the seller accepts the tender of breach, bringing suit upon the anticipatory breach to recover damages for the refusal to accept other installments of lumber not cut and tendered at the time of such breach, the measure of damages is the difference between the contract price and the cost of production." It is insisted that included in the cost of production, in addition to the amount of $1.29 per ton of ice as alleged and shown by the plaintiff, are certain other items under the heads of superintendence, insurance of the property, taxes, depreciation, etc., which would make a total of $1.425 per ton more, and that the damage incurred by reason of the breach is the difference between the aggregate of these two items, $1.29 plus $1.425, and the contract price of $3.25 per ton.

As an original proposition it can not be questioned that overhead charges such as are noted above are a part of the cost of production of the ice in question. Neither can it be denied, if the anticipatory breach of the contract had occurred before the plaintiff had built the plant and incurred the expense of superintendence, taxes, insurance, and the consequent depreciation of the buildings and machinery, that in a suit for such damages because of such breach the recovery would be limited to the difference between the contract price and the entire cost of production, which would include the items under both heads as noted above. After the plant was built in accordance with the contract, and the performance thereof begun and continued from 1927 until 1932, these items of fixed charges became a necessary part of the expenses of the producer whether ten thousand or twenty thousand tons were manufactured each year. An examination of the record in *White & Hamilton Lumber Co.* v. *Lynch,* supra, discloses that no issue was raised as to any segregation of the costs of manufacture of the

lumber, it being alleged that the cost of manufacture was $15 per thousand feet and the contract price was $20 per thousand feet, the items of cost being divided as stumpage $3 per thousand, and $12 for sawing; and it being alleged that $5 per thousand was the amount the plaintiff lost by reason of the breach of the contract. Under the facts as alleged there can be no question that the rule laid down measuring the damages was the correct rule in such case. Judge Hines in the opinion said: "We do not think that the measure of damages in such a case is the same, both as to the manufactured and unmanufactured goods. It is well settled that a party to an executory contract may always stop performance by the other party by an explicit direction to that effect, though *he thereby subjects himself to the payment of such damages as will compensate the other party for the loss he has sustained by reason of having his performance stopped at that stage in its progress.*" (Italics ours.) It may readily be seen that where there is an anticipatory breach of a contract of sale of goods before there has been a part performance, the seller's damage is necessarily the difference between the cost of manufacture or production and the contract price, or the profits he would have made if the contract had been performed. The principle expressed in *White & Hamilton Lumber Co.* v. *Lynch,* supra, does not change the principle laid down in former decisions of this State, but is declaratory of the measure of damage as applied to the facts of the case under consideration. In *Wallace* v. *Tumlin,* 42 *Ga.* 471, the court quoted approvingly the following: "He was entitled to recover the contract price of the work, deducting the cost of finishing the work." To our minds, where there has been a part performance of the contract and certain fixed charges have been assumed by the injured party, these charges become items already expended, or to be expended, irrespective of the breach of the contract, and as such are not to be counted in "the cost of finishing the work." This principle is stated in the rule "that the seller is entitled to such damages as will put him in the same position as if he had been permitted to perform his contract." In *Carolina Portland Cement Co.* v. *Columbia Improvement Co.,* 3 *Ga. App.* 483, 490 (60 S. E. 279), the following was quoted approvingly: "If the contract is for the sale of goods to be manufactured or otherwise procured by the seller, and the buyer refuses

to accept or gives notice that he intends to refuse acceptance, so that the seller is excused from procuring and tendering the goods, he will be entitled to such damages as will put him in the same position as if he had been permitted to complete the contract. Tiffany on Sales, 232, 233." In *Albany Phosphate Co. v. Hugger*, 4 *Ga. App.* 771, 776 (602 S. E. 533), it was said: "The law always seeks to give a remedy commensurate with the injury. 'The injured party is to be placed, as near as may be, in the situation he would have occupied if the wrong had not been committed.' . . Accordingly where a promise has been made and broken, the promisee ought to be put as near as may be in the same situation he would have been in if the promise had been kept."

In the present case, according to the contract, had the minimum amount of ice, 40,000 tons, been taken by the defendant and paid for, the plaintiff would have received $130,000. Under the evidence, only 17,727 tons were accepted and paid for. The plaintiff by reason of the contract had assumed the burden of the expense of the fixed charges or "overhead expense" which had to be paid irrespective of whether ten thousand or twenty thousand tons were delivered each year. This fixed charge or overhead was necessarily in contemplation of the parties at the time of the making of the contract; and unless it is paid to the seller, he can not be placed in the same position he occupied before the making of the contract. *Mimms v. Betts Co.*, 9 *Ga. App.* 718, 721 (72 S. E. 271), was a suit by one who contracted to supply a certain number of teams to haul logs during the year 1908. Where, after having entered upon the performance of the work, the defendant in June of the year had refused to allow plaintiff to continue his hauling, the court in laying down the measure of damage said: "Take the gross amount the plaintiff would have earned if he had been allowed to continue in the performance of the contract, and deduct from it such portions of the amount he would necessarily have expended in fulfilling the contract *as were saved to him* [italics ours] by reason of his not being required to perform." It is true that any ice the plaintiff may have manufactured and sold to outside parties should bear its proportionate part of the overhead expense and the defendant have the benefit of such saving. This principle holds true because it is the duty

of the plaintiff to mitigate or diminish the damage as much as is possible. When one party contracts with another for the manufacture of a specified article, which necessarily requires the building of a plant and installation of machinery, and the assumption of the expense of superintendence, taxes, insurance, and depreciation of the property, it may be naturally assumed that a breach of such contract by the buyer of the articles to be manufactured will cause loss or damage to the seller or manufacturer, by reason of the fixed charges or expense he has incurred because of the contract; and such damages, although they may be subject to diminution, may be said to have been naturally in contemplation of the parties if such a breach should occur. This is but another way of stating the principle laid down in 17 C. J. 847: "The measure of damages in the case of a breach of contract is the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented or the breach of it entailed. In other words, the person injured, is, so far as it is possible to do so by a monetary award, to be placed in the position he would have been in had the contract been performed." This same principle is followed in 24 R. C. L. 117. The very question we are here considering was dealt with in Jessup & Moore Paper Co. v. Bryant Paper Co., 297 Pa. 483 (147 Atl. 519). In that case the plaintiff agreed to furnish a specified amount of paper pulp each month at fixed prices. A part of the amount contracted for had been accepted, but a large portion was unaccepted. In discussing the measure of damages it was said: "In determining loss of profits to seller for buyer's repudiation of contract to purchase pulp not actually prepared because of buyer's intention not to carry out the contract, overhead expenses of the seller, and taxes, legal fees, insurance premiums on the life of the seller's president, interest on corporate indebtedness and depreciation reserves, which were constant in character, and would not have been affected by the performance of additional work, were not necessarily incident to the carrying out of the contract and *could not be added to the cost of manufacture* [italics ours], to reduce damages allowed to the seller under sales act of May 19, 1915." The sales act referred to provides in substance that where a buyer refuses to accept goods purchased, he shall be liable for damages directly and naturally resulting in the ordinary course

from the buyer's breach of the contract. It may be readily seen by a comparison of the terms of that act with our own Code, § 20-1407, that they are similar.

In *Holston Box & Lumber Co.* v. *Vonberg*, 34 *Ga. App.* 298 (129 S. E. 562), it was said: "But if the lumber has been cut and tendered, or the processes of manufacture are completed so that the goods are on hand ready for delivery at the time of such breach, the measure of damages is 'the difference between the contract price and the market price at the time and place of delivery' (citing the *White & Hamilton* case, supra). 'If the cost of delivery at the place fixed therefor is saved to the seller, deduction therefor should be made.' 24 R. C. L. 116 (§ 386)." The converse of that proposition is true; and if the cost of the delivery is not saved to the seller, the buyer becomes liable therefor, under the principle that the seller is entitled to be placd in the same position he would have been in had the contract been performed. The defendant's counsel cite Worrell *v.* Kinnear, 103 Va. 719 (49 S. E. 988, 2 Ann. Cas. 997), which dealt with the breach by a buyer of an executory contract for the sale and erection of 73 galvanized steel-shutter doors. On the day next after the acceptance of the order by which the contract had been consummated, the buyer withdrew the acceptance, and notified the seller of his intent to cancel it. The Virginia court held that the measure of damage was the difference between the contract price and the cost of production or manufacture and delivery, and that in determining that cost of manufacture and delivery a due proportion of the seller's "fixed charges" (overhead) should be taken into consideration. It is clearly apparent that in such case this was a proper measure, for the reason that the parties would thereby be placed in the same position as they would have been in had the contract been performed. A different rule might have been applied had the seller, by reason of the contract, expended large sums in preparations for the manufacture of such doors, and, after having done so and made delivery of some of the doors, the contract had been rescinded. As was said by Judge Hines in the *White & Hamilton* case, supra: "The general rule is stated in the Civil Code (1910) § 4131 [96-113]. It is applicable where the seller has the goods on hand, and can deliver them to the buyer." He then proceeded to fix the rule pertinent to the

facts of the case under consideration, and the rule fixed in that case was measured by the Code section 4390 [20-1402], that "Damages are given as compensation for the injury sustained," and in that case such damage was the difference between the cost of production and the contract price. This ruling is in harmony with what has heretofore been said by the courts of this State, as well as the text-book writers and the great weight of authority in every jurisdiction. It does not contravene the rule fixed in the Code, that the damages recoverable for breach of a contract are such as arise naturally and according to the usual course of things from such breach, which is but another way of saying that the injured party is entitled to such damages as will put him in the same position as if he had been permitted to complete the contract. This principle carries with it the corresponding duty on the part of the injured party to lessen the damage as far as is practicable. Code, § 20-1410.

We think the rule may be stated as announced in the *White & Hamilton* case, supra, that "Where there is an anticipatory breach of the contract and the seller accepts the tender of breach, bringing suit upon the anticipatory breach to recover damages for the refusal to accept other installments [which are not at that time manufactured], . . the measure of damages is the difference between the contract price and the cost of production," provided such measure of damage will place the parties in the same position they would have occupied had the contract been fully performed. Expenses which have become fixed and inevitable by reason of the entering into of the contract are not such items of the cost of production as will limit the seller, upon a breach by the buyer of the contract, to a recovery of the profits which would be earned when such fixed items are figured in making up the total cost of production. In other words, such a calculation would not place the seller in the same position as he would have occupied had the contract been fully performed, nor would it compensate him for the injury sustained. That this principle is in accord with the universal rule is evidenced in 1 Restatement of the Law of Contracts, § 329: "Where a right of action for breach exists, compensatory damages will be given for the net amount of the losses caused and gains prevented by defendant's breach, in excess of savings made possible." And further, as stated in com-

ment A of that section: "In awarding compensatory damages, the effort is made to put the injured party in as good position as that in which he would have been put by full performance of contract." By reason of this contract made in 1926, the plaintiff incurred certain fixed items of expense. These items which are not saved to it in the breach of the contract become a loss, and such loss incurred as well as gains prevented, under the facts of this case, become the measure of damages for breach of contract. Under this view, it is unnecessary to consider the other exceptions. It was error for the court to apply to the facts of the present case such a measure of damage as would limit the plaintiff in its recovery to a profit which was measured by the difference between the contract price and the cost of production, which cost of production included the overhead or fixed charges as shown by the evidence.

*Judgment reversed on the main bill of exceptions, and affirmed on the cross-bill. Broyles, C. J., and MacIntyre, J., concur.*

ON MOTIONS FOR REHEARING.

GUERRY, J. This court stated in its opinion in this case as originally written that "damages were prayed for to the extent of the profit it would have made on the minimum amount of ice to be sold under the contract, or the difference between the contract price and the cost of producing and delivering the same." It appears from a further examination of the record that this allegation was stricken from the petition by amendment, and we have amended the opinion by striking therefrom this statement.

Counsel for the plaintiff has filed a motion for rehearing, complaining of the following language used in the opinion: "It is true that any ice the plaintiff may have manufactured and sold to outside parties should bear its proportionate part of the overhead expense, and the defendant have the benefit of such savings." It will be borne in mind that the fixed or overhead charges are ordinarily a part of the cost of manufacture, and in an anticipatory breach of an executory contract they are to be considered in estimating the damages because of a breach of such contract, which damages are the profits the contracting party would have made if the contract were performed. It is true, had the defendant complied with its contract and purchased and paid for the full twenty thousand tons of ice yearly, that any amount of ice made and

sold by the plaintiff in excess of such sum would have yielded an additional profit to the plaintiff by reason of the fact that the overhead or fixed charges might have been cared for by the twenty thousand tons sold and paid for by the defendant, and the profits on this additional amount would have been larger because the overhead had already been cared for. It is not true, where the defendant has not taken the minimum amount, that any ice sold by the plaintiff to outside parties should not bear its proportionate part of the overhead, after taking into consideration the minimum amount to be taken under the contract. The measure of damages applied in this case is so applied because of the special contract between the parties, by reason of which the fixed charges were incurred. It is clear that had the buyer canceled the contract before the seller had assumed the burden of the overhead charges incidental to the manufacture of the ice, the seller's damages would have been limited to the difference between the cost of manufacture and the contract price; and that in estimating such cost of manufacture or production, overhead charges or fixed expenses incidental to the business would have been a proper item for consideration in determining the cost of production. It is also true that the duty to mitigate or diminish damages does not arise until a breach of the contract, and the breach of the present contract did not occur until the end of the year. This, however, does not affect the rule we have laid down, that the plaintiff is entitled to any damage caused by the breach, and this damage consists of losses sustained as well as profits denied which are caused by the breach of the contract. Profits denied, however, are profits arising out of the present contract, and not corporate profits or profits which the plaintiff might make out of other sales of ice. In other words, the defendant is under obligation to pay damages caused by its failure to take and pay for the minimum number of tons of ice. Until it has paid overhead charges on twenty thousand tons of ice, it is not entitled to any proration on other ice manufactured and sold. If the defendant had paid for the 20,000 tones of ice each year, and the plaintiff had sold an additional five thousand tons, the overhead or fixed charges of the plant would have been borne by the aggregate amount sold; that is to say, the cost of production chargeable to defendant in such a case would be in the ratio of 20 to 25 or 4/5 of the total cost. We are de-

ciding that the plaintiff may recover such items on the principle that it has been induced to occupy such a position and incur such expense in the first place because of the contract entered into between the parties, and losses sustained as well as profits denied are necessarily to be considered in placing plaintiff in the position it would have occupied had the contract been performed. Any failure by the defendant to take and pay for the minimum amount of ice contracted for caused a loss to the plaintiff; such loss or damage, so far as fixed overhead charges are concerned, is in the ratio or proportion that the 20,000 tons sustain to the entire amount of ice manufactured and sold by the plaintiff, to wit, 20,000 tons plus any tonnage produced and sold by the plaintiff to outside parties. The proportionate part of the cost of manufacture or overhead expense, as referred to in the opinion, means that the defendant, having entered into a contract to take a minimum of 20,000 tons each year, must pay at least the overhead on that much ice each year. If outside parties should take 5000 tons of ice, the plaintiff's overhead should be allocated to 25,000 tons of ice, and the defendant pay 4/5 of the overhead expenses, and 1/5 be borne by the ice sold to outside parties. If 20,000 tons were sold to outside parties, it would bear 1/2 the overhead. If only 9000 tons were taken by defendant and 5000 tons were sold to outside parties, the proportionate part is not 9/14 and 5/14, but is still 4/5 and 1/5; or if the defendant took no ice, and the plaintiff sold 5000 tons to outside parties, the defendant should still pay the overhead on 20,000 tons, and the 5000 tons pay 1/5 the overhead expense.

Counsel for the defendant also has filed a motion for rehearing. We have carefully read this motion, and we find nothing therein discussed or contended for that was not covered by our original opinion. Both motions are denied.