**CROWN CONSTRUCTION COMPANY**

v.

**OPELIKA MANUFACTURING CORPORATION and Fidelity and Deposit Company of Maryland.**

**Civ. A. No. 15092.**

United States District Court,
N. D. Georgia,
Atlanta Division.

June 30, 1972.

Smith, Currie & Hancock, Atlanta, Ga., for plaintiff and co-defendant Fidelity and Deposit Co. of Md.

King & Spalding, Atlanta, Ga., Foss, Schuman & Drake, Chicago, Ill., for Opelika Mfg. Corp.

ORDER

O'KELLEY, District Judge.

This is an action by Crown Construction Company against Opelika Manufacturing Corporation alleging breach of a construction contract. Crown has alleged damages totalling $114,981.00.

---

1. *See* United States v. Thorndal, Crim. No. 548 (D.N.D. Nov. 12, 1970).

Opelika answered the complaint and filed its counterclaim for breach of the same contract against Crown and Crown's surety, Fidelity and Deposit Company of Maryland, alleging damages of $28,000.00 plus other costs and loss of profits. Both parties have moved the Court for summary judgment on the question of liability for the alleged breach of contract. The Court has jurisdiction over the subject matter of this action under authority of 28 U.S.C. § 1332.

Plaintiff, Crown Construction Company, is a Georgia corporation engaged in the business of construction as a general contractor. Defendant, Opelika Manufacturing Corporation, is an Illinois corporation having its principal office and place of business in a state other than Georgia but is qualified to do business and is doing business in the State of Georgia. At some time prior to March 31, 1970, the defendant contemplated construction of a bleaching and finishing addition and a new warehouse addition to its sewing and finishing plant located in Hawkinsville, Georgia. The accepted procedure in construction contracts of this nature is to have the owner or architect formulate a blueprint of plans and specifications upon which the construction project is to be based. Pursuant to these plans, a bid proposal form is prepared designating the prospective work, and these proposals are mailed to various contractors who submit their calculated bid estimates. This procedure was followed by both parties, and plaintiff was determined to be the low bidder on March 31, 1970. The defendant refused to accept this bid offer and subsequently discontinued all work because of its inability to pay for the project. Defendant promised that at such time as there was reactivation, plaintiff, as apparent low bidder, would be afforded "preferential treatment."

By letter of February 8, 1971, defendant, through its architect, again invited plaintiff to submit a bid proposal on revised plans and specifications prepared by the architect. Plaintiff obtained copies of the revised plans and specifications prepared by defendant's architect and prepared a bid proposal for the project on defendant's bid proposal form. At the second bid opening of March 2, 1971, plaintiff was again determined to have submitted the lowest responsible and responsive bid proposal. Subsequent thereto and on March 31, 1971, defendant, through its architect, accepted plaintiff's bid proposal by telegram and thereby entered into a construction contract with plaintiff.

On or about April 2, 1971, defendant sent a formal construction contract to plaintiff. This contract was returned to defendant for the purpose of correcting certain technical errors made therein. In the meantime, plaintiff began preparing to perform construction; and as part of this preparation, requested of defendant's architect when it could expect assignment of the mechanical, fire protection and electrical subcontracts. Through conversation and correspondence, plaintiff was informed by defendant's architect that defendant had decided not to assign these subcontracts to plaintiff at the agreed upon management fee, but had decided to allow the architect to coordinate construction instead. Plaintiff, upon receipt of this information, indicated to defendant, by a telegram of April 15, 1971, confirmed by letter of the same date and by a subsequent letter of April 20, 1971, that plaintiff stood ready, willing and able to carry out its contractual commitments to defendant. Furthermore, if defendant persisted in its announced intention not to assign these subcontracts, then plaintiff would "have no alternative but to assume that Opelika Manufacturing Corporation would not perform its contractual commitments and assign these subcontracts, and thereby, require us [Crown] to seek relief in the appropriate form." The ultimate result became clear; plaintiff would not build the projects without assignment of the mechanical, electrical and fire protection contracts, and defendant would not assign such contracts to plaintiff.

The redrafted formal contract was sent to plaintiff on or about April 21, 1971. This contract was never signed, and defendant's architect requested, on or about April 26, 1971, that plaintiff return all the various documents to defendant, which plaintiff did on or about April 28, 1971. Subsequently, Opelika entered into a contract with the next lowest bidder, Fiske Carter Construction Company, to build the subject additions. Thus, the case is ripe for this Court's consideration concerning the alleged breach of contract.

The controversy which has given rise to this cause of action is in the form of a disputed interpretation to be given certain language in the contract regarding assignment of subcontracts:

"In addition to the above, the undersigned *bidder agrees that he will accept assignment* from the Owner of the mechanical, fire protection, and electrical subcontracts for management under the General Construction Contract. . . ." [Emphasis Added.]

Plaintiff alleges that this particular phrase clearly requires a mandatory assignment of the subcontracts in question. Defendant contends that this interpretation by the plaintiff is incorrect in view of a literal reading of the phrase, and that by no stretch of the imagination can this language be construed to contemplate a required assignment of the subcontracts on the part of defendant.

The parties have apparently conceded, and the Court likewise finds that a contract was in fact entered into between the parties on March 31, 1971, when the defendant telegrammed his acceptance of the bid proposal to plaintiff. The problem then arises as to what construction is to be given the disputed language in that contract.

The defendant relies on the case of Manget v. Carlton, 34 Ga.App. 556, 130 S.E. 604 (1925). There the parties entered into the following agreement:

"In consideration of sale or exchange of farm in Wayne County *Carlton agrees to accept fifteen notes* of $1,000.00 each, payable on 1st Oct. 1922, and one payable each month thereafter on the first day, in full settlement of all interest he has and all obligations in regard to trade." [Emphasis Added.]

In finding that the "agreement to accept fifteen notes" did not in turn obligate the defendant in absence of such agreed upon language, that Court stated:

"The second count is fatally defective because the instrument declared on contains no promise on the part of the defendant. It shows that Carlton agreed to accept notes in the aggregate of $15,000 in settlement of the controversy, but not that Manget agreed or promised to give them or pay this or any other amount. The undertaking was purely unilateral, purporting only to bind Carlton, notwithstanding it was signed by both parties. Payment cannot be exacted of Manget merely upon Carlton's promise to accept it." (p. 560, 130 S. E. p. 606)

This Court agrees with that reasoning in support of its conclusion that the "agreement to accept" the subcontracts did not in turn obligate the defendant to a required assignment of those subcontracts. This particular phrase of the contract is totally unilateral and not binding on both parties, when viewed in light of the language in Cooley v. Moss, 123 Ga. 707, 51 S.E. 625 (1905):

"Mutual agreements or promises may furnish a consideration one for the other, but where one party does all the promising and agreeing, the mere fact that the other signs his name to the paper is not sufficient to constitute an agreement on his part." (p. 711, 51 S.E. p. 627)

These cases would infer the principle that one who "agrees to accept" an obligation cannot expect or require the fulfillment of that obligation from the other party in absence of the express inten-

tion of both parties that they are to be mutually obligated. In the present case, the plaintiff "agreed to accept" assignment of the subcontracts, but nowhere does the evidence before this Court reveal an expressed obligation on the part of defendant to so assign those subcontracts. It is the purpose of this Court to construe the language as written and not to innovate a meaning which does not exist. The phrase in dispute is *not* ambiguous, but is clearly binding on the parties on the face of its literal interpretation. This Court will not misapply that language so as to obligate parties to a contractual provision for which they did not intend nor negotiate. When viewed in the light of similar case law interpretation, the language in dispute as seen in the eyes of the Court does not require an assignment by the defendant of the subcontracts in question. See also, All Church Press Incorporated v. E. C. Harris Advertising Agency Incorporated, 36 Ga.App. 616, 138 S.E. 85 (1927).

The plaintiff attempted to distinguish these cases from the case, *sub judice,* on the ground that all cases cited by defendant stood for the principle that *no* contract existed because of their unilateral nature. The Court has previously determined that a contract was in fact entered into on March 31, 1971, therefore, this argument is without merit.

■ Plaintiff has raised the argument that the representative of defendant's architect had verbally corresponded with officers of plaintiff, and that the subject of assignment of the subcontracts had been discussed between the parties. Therefore, the representative of defendant's architect was aware of the plaintiff's intentions concerning the assignment of the subcontracts, and these intentions were imputable to the defendant. This argument is without merit. The evidence before this Court reveals that no direct conversation concerning the subject of assignment ever took place between the parties. Defendant's representative, Delk, says that he

never interpreted plaintiff's intentions about assignment to be what they now allege; therefore, how can unknown information of the representative be imputed to the defendant. Furthermore, Ga.Code Ann. § 20–703, which the plaintiff refers to as binding the defendant, has no application where the contract and the terms involved are not ambiguous. See, Village Enterprises, Inc. v. Georgia Railroad Bank & Trust Co., 117 Ga.App. 773, 161 S.E.2d 901 (1968). The Court has previously determined that the language in dispute is *not* ambiguous, thus § 20–703 is not applicable.

■ Plaintiff alleges that defendant's failure to submit a correct formal contract subsequent to the bid proposal acceptance and in compliance with the previously agreed upon terms was a breach of contract. This argument is without merit in view of the case of Lott-Lewis Company v. Bingham-Hewett Grain Company, 28 Ga.App. 728, 113 S.E. 222 (1922):

> "A valid, binding contract having been made by the letters and telegrams exchanged by the broker and the plaintiff, it was immaterial that the defendant subsequently refused to sign a formal written contract tendered by the plaintiff, and it was also immaterial whether or not this formal contract contained material variations from the contract previously agreed to by both parties." (p. 729, 113 S.E. p. 223)

The Court has previously determined that a contract was entered into between the parties on March 31, 1971; therefore, the subsequent incorrect formal contract is immaterial.

■ For the above reasons, the Court determines as a matter of law that the disputed language, "agrees to accept," does not mandatorily require the assignment of the subcontracts to plaintiff by defendant. The refusal of the plaintiff to perform the contract in the face of defendant's refusal to assign the subcontracts is determined by the Court to be a breach of contract, and the defendant's

subsequent contract with Fiske Carter Construction Company was lawfully authorized under Ga.Code Ann. § 20–1410. The defendant is entitled to damages for the difference between the bid proposal in the former contract and the bid proposal in the latter contract, that amount is $28,000.00.