**MACON–BIBB COUNTY WATER AND SEWERAGE AUTHORITY, Plaintiff,**

v.

**TUTTLE/WHITE CONSTRUCTORS, INC., Defendant/Third-Party Plaintiff,**

**FEDERAL INSURANCE COMPANY, Defendant,**

v.

**ZURN INDUSTRIES, INC., Third-Party Defendant.**

**Civ. A. No. 79–145–MAC.**

United States District Court, M. D. Georgia, Macon Division.

Dec. 23, 1981.

Wallace Miller, Jr., Macon, Ga., for plaintiff.

Richard C. Bradley, III, Jackson, Miss., John C. McIntyre, Jr., Atlanta, Ga., for defendant/third-party plaintiff.

## ORDER

OWENS, Chief Judge.

This action for breach of contract and tortious interference with business dealings

is presently before the court on the parties' motions for summary judgment. The plaintiff, Macon-Bibb County Water and Sewerage Authority ("Authority") is a public body responsible for constructing and managing the water and sewerage system for Macon and Bibb County, Georgia. It owns and operates two treatment and disposal systems which discharge treated sewage effluent into the Ocmulgee River, which in turn flows into the Atlantic Ocean. The defendant Tuttle-White Constructors, Inc. ("TWC") is a general contractor. The defendant Zurn Industries, Inc. ("Zurn") manufactures various items of equipment for use in different phases of water pollution control. In the instant case, TWC was to be the prime contractor and Zurn a subcontractor.

The pertinent facts which form the basis of this dispute are as follows:

In order to comply with provisions of the Federal Water Pollution Control Act, the Georgia Water Quality Control Act and their accompanying regulations and orders, the Authority determined that it would be necessary to supplement and more efficiently treat and dispose of sewage waste at its Rocky Creek Treatment Plant. After its engineers designed a project which would accomplish this purpose, the Authority advertised for bids for construction of the project.

One of the specifications in the Rocky Creek Project called for the installation of certain "sludge incinerators" of a type manufactured by Shirco, Inc. ("Shirco"). Prior to the submission of any bids on the project, however, the engineers approved Zurn as a potential alternative source for the sludge incinerators. Zurn submitted a written proposal to TWC setting forth the terms and conditions on which Zurn would furnish the sludge incinerators. TWC then submitted its bid, which included Zurn's incinerators, to the Authority and when the bids were opened on September 28, 1978, TWC had the lowest bid at $8,694,000.

After the opening of the bids but before the award of any contracts Zurn's competitor, Shirco, threatened legal action against the Authority and others if Zurn's incinerators were used, contending that the use of such incinerators would violate certain patents held by Shirco. Although the bid documents contained patent indemnification terms, there was concern that these terms did not offer sufficient protection against Shirco's threatened lawsuits. To remedy this problem the Authority, TWC and Zurn began a series of negotiations over the terms of the proposed patent indemnity agreement to be executed by Zurn. These negotiations were conducted through a series of meetings and proposed drafts exchanged among the parties. It is from this point on that there is much disagreement and confusion as to both the order and importance of the parties' transactions.

Briefly, the plaintiff claims that it awarded the contract for construction of the project to TWC on December 21, 1978, subject to Zurn providing an indemnity agreement and bonds and subject to approval of the project by the EPA and EPD. Further, plaintiff claims that it accepted Zurn's draft of an indemnity agreement which was the subject of the negotiations mentioned above on or about January 18, 1979, and that the EPA and EPD approved the project on February 22, 1979, and March 5, 1979, respectively. Thereafter, according to plaintiff, problems developed concerning the remaining condition, i.e., execution of an indemnity bond as required by the accepted indemnity agreement. On March 25, 1979, TWC and its surety signed the Contract Documents and returned them to the Authority for its signature. On April 6, 1979, Zurn notified TWC that it was withdrawing its bid and on April 11, 1979, TWC informed the Authority that because of Zurn's withdrawal, it could not perform its contract with the Authority and was thus withdrawing its bid. Based on its interpretation of the facts, the Authority claims: (1) that TWC's withdrawal breached its contract with the plaintiff, (2) that Zurn's refusal to furnish the indemnity bond was a breach of the Indemnity Agreement entered January 18, 1979, and (3) that this refusal amounted to a tortious interference

with the contract between plaintiff and TWC.

Defendant TWC, however, contends that there was never an enforceable contract between it and the Authority. The December 21, 1978, "award" of the contract was conditional, and all of the conditions were not met. Zurn never furnished the required indemnity bond and as for the January approval of the patent indemnity agreement, TWC argues that there was never a resolution by the Authority officially approving it. Furthermore, the Authority's execution of the Contract Documents on May 10, 1979, came at least 43 days after their execution by TWC and return to the Authority, and this exceeded the 30-day time limit the Authority had for execution of the documents. Thus, the Authority's supposed execution came after TWC's bid had expired and amounted to only a counteroffer. Even if there was a contract, TWC claims that the December 21, 1978, resolution by the Authority amounted to an illegal modification of the contract which made it impossible for TWC to perform and for which TWC is claiming entitlement to its lost profits and costs for delay. As for Zurn, TWC claims that there was a binding contract between it and Zurn for the purchase of the incinerators because there was the requisite agreement on the basic terms, citing U.C.C. §§ 2–204 and 2–206. According to TWC, Zurn anticipatorily breached this contract and by so doing caused TWC to be unable to perform any contract it may have had with the Authority. As a result, Zurn should indemnify TWC for the amount of any judgment obtained by the Authority against TWC.

Like TWC, Zurn contends that all of the conditions precedent to award of the contract were not met before its withdrawal. As of April 6, 1979, the date Zurn says it withdrew from negotiations, at least two of these conditions had not been met, i.e., agreement on the conditions and terms of a patent indemnity bond and approval by the EPA. In fact, Zurn contends that even though the EPA heard and denied the Shirco protest pursuant to the provisions of 40 C.F.R. 35.939, this did not constitute final approval by the EPA, and in fact the EPA *never* gave the approval which the Authority contemplated as a condition precedent to awarding the contract to TWC. In addition to claiming there was never a contract between the Authority and TWC, Zurn contends that its proposed contract with TWC ("Purchase Order") was never binding because certain conditions precedent were never met, i.e., final award of the contract from the Authority to TWC and execution of a satisfactory patent indemnity bond by Zurn. The proposed drafts expressly stated that either Zurn or TWC could withdraw without liability if any of the conditions were not met.

At a September 18, 1980, pretrial conference these differing opinions as to whether or not valid contracts ever existed were discussed at length. Also of concern were events which happened subsequent to the defendants' withdrawals. Sometime in 1979, after the defendants' withdrawal or repudiation, representatives of the Georgia Kraft Company advised the Authority that said company had acquired a new type of boiler for their industrial plant operations that could utilize the sludge from the Rocky Creek Plant by burning it as fuel. This was the same sludge that the Contract Documents contemplated would be incinerated by the Zurn manufactured incinerators included in TWC's bid. Furthermore, the Kraft representatives advised the Authority that the sludge could be so utilized by that company at a considerable savings in the cost of capital improvements to the Rocky Creek Treatment Plant, as well as in future operating costs. The Authority studied this proposal and determined that it would save approximately $1,220,000 in capital expenditures and $155,375 in annual operating costs by using the Kraft plan instead of the TWC and Zurn plan. As a result, the Authority decided not to build the project as originally designed, but to utilize the Kraft plan.

Given these subsequent events, the court expressed some concern as to just what damages, if any, the plaintiff had incurred, and directed the parties to brief the issue of damages first. In its response to the

court's request, the plaintiff has claimed that it is entitled to the following categories of damages: (1) compensatory damages for breach of contract, (2) punitive damages for tortious interference with business dealings, (3) attorneys fees, and (4) expenses. The plaintiff's Memorandum Brief on the Measure of Damages gives the following assessment of damages:

(a) The difference in the TWC bid and the next lowest bid which could be used to complete the project as originally planned ($9,883,700.00–$8,694,000.00).

(b) That portion of total engineering fees incurred in the TWC project which could not be used by plaintiff in the new (Kraft) project ($352,408.26).

(c) Attorneys fees ($58,817.51 plus).

The defendants, of course, deny that the Authority has suffered any damages assuming there even was a breach of contract. They contend that when the immense savings realized by the Authority as a result of its utilizing the Georgia Kraft plan are used to offset all of the losses the plaintiff claims it incurred, that these benefits are more than enough to cancel the losses.

Each category or class of damages to which the Authority might be entitled is considered below. A breach of contract or tortious conduct by defendants is assumed, but only for purposes of analyzing the question of the availability and amount of plaintiff's damages.

### (1) The Difference in Bids

■ Damages, as that term is ordinarily used, means simply a measure of injury. The purpose of damages is to place the injured person in the same position, so far as money can do it, as he would have been in had there been no injury or breach of duty, i.e., to compensate him for the injury actually sustained. *Roberts v. Sears, Roebuck and Co.*, 471 F.Supp. 372, vacated 617 F.2d 460, *cert. denied* 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237, *rehearing denied* 449 U.S. 1105, 101 S.Ct. 908, 66 L.Ed.2d 834; *Meltzer v. Roof Coatings, Inc.*, 536 F.2d 663 (5th Cir. 1976); *Freeport Sulphur Co. v. S/S. Hermosa*, 526 F.2d 300 (5th Cir. 1976);

*Pletz v. Christian Herald Ass'n, Inc.*, 486 F.2d 94 (5th Cir. 1973). The measure of damages when a breach of contract is involved is "the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented or the breach of it entailed." *New Amsterdam Casualty Co. v. Mitchell*, 325 F.2d 474 (5th Cir. 1963) *quoting Georgia Power and Light Co. v. Fruit Growers Exp. Co.*, 55 Ga.App. 520, 527, 190 S.E. 669, 672 (1937). *See also*, Georgia Code Annotated § 20–1407 (1977). The motive or state of mind of the defaulting party is irrelevant; the only concern is for that amount of money that will make the injured party "whole." *Fratelli Gardino S.P.A. v. Caribbean Lumber Co., Inc.*, 587 F.2d 204, reh. denied 590 F.2d 333 (5th Cir. 1979).

In the present case, the plaintiff is claiming, *inter alia*, that to be made whole the court must consider the defendant's bid for the Rocky Creek Project and that of the next lowest bidder. In other words, the correct measure of damages in a case of this nature is the difference between the lowest bid and the next lowest bid; citing *Crown Construction Co. v. Opelika Manufacturing Corp.*, 343 F.Supp. 1266 (N.D.Ga., 1972). However, because the second lowest bidder would no longer construct the project for its original bid, the proper measure of damages should be the difference in the TWC bid and the increased figure of $9,883,700 given by the next lowest bidder, this difference being $1,189,700. Plaintiff contends that this is not a windfall, but rather is exactly what is contemplated by Georgia Code Annotated § 20–1407.

■ The court does not agree with this assessment of the Authority's damages. General damage rules such as the one relied on by the plaintiff do not exist in a vacuum. They are to be utilized in light of the particular circumstances of each case, and are to be subject to certain limiting exceptions. One of these limiting rules is that an abstract measure of damages should not exceed the *actual* damages suffered. *Missouri Pacific R.R. Co. v. H. Rouw Co.*, 258 F.2d 445, 448 (5th Cir. 1958); *Stolz v. Kapp*, 156

Ga.App. 169, 274 S.E.2d 142 (1980). In *Stolz* for example, appellant entered a contract with appellee to purchase a lot and have appellee construct a home for $58,-500.00. In the course of construction, the appellant requested and got changes made in the structure, but before the house was completed appellant became dissatisfied, repudiated the contract and sued for his earnest money. The appellee countered by demanding $1,060.00 which it cost him to reverse the modifications which he had made at appellant's request. The court of appeals refused to award these expenses, explaining that "the record does not show that appellee incurred any damages because of the changes it made after appellant repudiated the contract; *the house was sold to a third party (by appellee) for $62,000.00 one week after construction was completed.*" *Id.*, at 143 (emphasis added). In essence, the $3,500.00 that appellee gained by being able to sell the house to someone other than appellant was used to offset the expenses he incurred in reversing the modifications.

■ This method of offsetting the damages suffered from a breach or tortious conduct by the benefits in savings or profits from that breach is appropriately called the theory of offsetting benefits. It is advanced by the defendants in the instant case as a necessary ingredient in determining the Authority's actual damages.

■ Basically, where the defendant's tortious misconduct or breach of contract causes damages, but also operates directly to confer some benefit upon the plaintiff, the plaintiff's claim for damages may be diminished by the amount of the benefit received. Dobbs, Dan B., *Remedies* § 3.6 at p. 181 (1973). The offset theory can only be utilized "when the benefits accruing to the plaintiff are sufficiently proximate to the contract to warrant reducing the plaintiff's damages and the failure to do so would permit the plaintiff to obtain unreasonable damages." *Louisiana Sulphur Carriers, Inc. v. Gulf Resources and Chemical Corp.*, 53 F.R.D. 458, 462 (D.Del.1971). When the offset theory is available, it involves two

basic situations. First, the means necessary for the plaintiff to have obtained the profit or savings from the subsequent contract would have been unavailable if the original contract had been performed. Second, the breach resulted in a direct and immediate savings to the plaintiff, i.e., savings on the cost of performance. *Id.*, at 462.

■ This theory is clearly applicable in the present case. When TWC's bid on the original project fell through, the Authority decided to use an alternate and much less expensive method of sludge incineration. This new method saved the Authority $1,220,100.00 in capital expenditures and will save the Authority an additional $155,-000 per year in operating expenses over the life of the incineration plant. As for the two factors mentioned above, it is obvious that the plaintiff realized a direct savings in the cost of its performance in excess of $1,220,100.00. In addition, the Authority could not have obtained this savings if TWC had performed its obligations on the original contract.

Neither is the court persuaded by the plaintiff's argument that the offsetting benefits rule is inapplicable in the present case because the benefits it received from the Georgia Kraft plan were from a "collateral source."

"As a general rule, benefits received by the plaintiff from a source collateral to the tortfeasor or contract breacher may not be used to reduce the defendant's liability for damages. This rule holds even though the benefits are payable to the plaintiff because of the defendant's actionable conduct and even though the benefits are measured by the plaintiff's losses." Dobbs, *Remedies* at p. 185.

For example, if a defendant's negligence causes plaintiff's injuries, plaintiff may recover from defendant for medical expenses even though the plaintiff's accident and health insurance policy paid all of his medical expense. Similarly, if the injured plaintiff's employer gives the plaintiff money equal to his salary while he is in the hospital, the plaintiff is still entitled to recover for the value of his lost working capacity. *Id.*

The Authority contends that the collateral source rule applies in this case because there is "no connection, relationship or bearing between the breaches of contract by TWC and Zurn and the tortious conduct of Zurn, on the one hand, and the contract between the Authority and Georgia Kraft Company . . ." on the other hand. Citing 25 C.J.S. Damages § 97, p. 1003.

It is true that the collateral source rule has been used many times in Georgia to bar the defendant from offsetting benefits the plaintiff received as a result of defendant's breach or tortious conduct. *Cincinnati, New Orleans and Texas Pacific Railway Co. v. Hilley*, 121 Ga.App. 196, 173 S.E.2d 242, 246, n.2 (1970). However, in each of these cases the benefits received were the result of the plaintiff's forethought (for instance, in purchasing insurance) or a gift or benefit. from a "distinct" third party (as in the payment of lost wages by relatives).

■ In contrast, Georgia Kraft in the instant case is not such a sufficiently distinct third party. The contract with TWC concerning the Rocky Creek Project was made in furtherance of an overall plan between the Authority and Georgia Kraft dating from 1970 and concerning the construction and operation of the plant and concerning additions and betterments to the plant. Furthermore, it is evident from the record that the Authority needed and wanted only one system for disposal of the sewage sludge, and that there was never an intention to construct two projects. Both the original project and the Georgia Kraft plan were designed to burn the same sludge; and the Georgia Kraft project will occupy the same piece of land intended for the original project. In short, the two construction projects are mutually exclusive, and but for the defendants' presumed breach and tortious interference, the Authority would not have turned to the Georgia Kraft plan. Therefore, it is obvious that the subsequent contract with Georgia Kraft was *not* an independent collateral transaction with no relation to the defendants' breached contracts.

■ As stated above, the purpose of compensatory damages is to compensate the plaintiff for injury actually sustained. When the benefits which plaintiff received (over $1,220,000.00) as a proximate result of the defendants' presumed breaches are taken into consideration, it is evident that the plaintiff is not entitled to the $1,189,700.00 difference between the TWC bid and the next lowest bid.

### (2) Engineering Fees

Just as offsetting benefits eliminated the difference—demanded as damages by the Authority—between the TWC bid and the next lowest bid, they may result in no awardable damages for engineering fees incurred as a result of the breach. Plaintiff claims that of a total of $593,593.02 in engineering fees it paid for services rendered in connection with the TWC bid project from its inception up to August 22, 1980, the sum of $352,408.26 is attributable to fees for services rendered for which no benefit or utility whatsoever will be derived or utilized by plaintiff in connection with its newly proposed improvements and betterments to the Rocky Creek Plant in conjunction with the Georgia Kraft Company. This $352,408.26 is broken down as follows: $326,240.00 for the originally conceived project, including the on-site electrical incineration; $17,028.61 for work performed by the engineers in resolving the Shirco protest; and $9,137.65 for services rendered pertaining to the instant lawsuit.

■ Like the requested difference in bids, these claimed damages are compensatory in nature and thus subject to the rule of offsetting benefits. If the benefit the Authority derived from the breach is equal to or greater than the amount of these engineering fees, then it may not be compensated for them. The amount of the claimed engineering fees does exceed the difference left after subtracting the $1,189,-700.00 from the $1,220,000.00 of capital expenditures which was saved; i.e., if only the savings in capital expenditures is used to offset plaintiff's losses, there is only $30,-300.00 in such benefits left after subtract-

ing plaintiff's claimed damages of $1,189,-700.00. However, in addition to a savings in capital expenditures, there is also a $155,-000.00 per year savings in operational costs as a result of the alleged breach. If the life of the disposal system in the Kraft project is three or more years, this savings in operational expenses would more than offset the claimed engineering fees.

There is, however, nothing in the record as to the expected life of the Kraft project, and thus no way to estimate the total annual savings in operational expenses. In all probability savings *will* offset these expenses; however, based on the existing record the court cannot say whether any part of the amount expended as engineering fees is recoverable.

### (3) Liquidated Damages

█ It is the court's considered opinion that the Authority should receive no damages under Paragraph 7 of the General Conditions of Contract. Paragraph 7 states in pertinent part:

> "If the Contractor ... violates any provision of the Contract Documents ... the Owner may ... terminate the services of the Contractor ..., and finish the work by whatever method he may deem expedient. In such case the Contractor shall not be entitled to receive any further payment until the work is finished. If the unpaid balance of the contract price exceeds the direct and indirect costs of completing the project including compensation for additional professional services, such excess shall be paid to the Contractor. If such costs exceed such unpaid balance, the Contractor and/or his surety shall pay the difference to the Owner. Such costs incurred by the Owner will be determined by the Engineer and incorporated in a change order."

The court interprets this provision as one for liquidated damages, establishing the method for measuring damages in the event of a breach by the contractor. *See* Georgia Code Ann. § 20–1402; *White Farm Equipment Co. v. Jarrell and Clifton Equipment Co.*, 139 Ga.App. 632, 229 S.E.2d 113 (1976). Based upon the terms of this provision, it is

obvious that the plaintiff has finished the work by the method it deemed expedient. Applying the formula of Paragraph 7, however, the Authority has suffered no recoverable damages.

Even if there were a possible construction of this liquidated damages clause and formula that could arguably call for an award of damages, the court sees two additional problems with awarding liquidated damages: In the first place, the court is not convinced that the ascertainment of actual damages at the time of contracting was either impracticable or extremely difficult. *Ernst v. Manhattan Construction Co. of Texas*, 551 F.2d 1026 (5th Cir. 1977); *Higgs v. United States*, 546 F.2d 373 (Ct. of Claims 1976); *Freeman v. Warrior*, 409 F.2d 1101 (10th Cir. 1969). Second, in view of the fact that the defendants' breach presented the Authority with a *substantial* benefit, awarding an amount contemplated as liquidated damages might under the specific circumstances of the instant case amount to merely penalizing the defendant for its breach, a clearly impermissible result in cases for liquidated damages for contract breach. In any event, the court finds it unnecessary to attempt to resolve these issues, as the formula itself precludes any recovery as liquidated damages.

### (4) Punitive Damages

█ Unlike compensatory damages, whose primary purpose is to make the injured party whole, punitive damages are usually awarded as a punishment or a deterrent and are levied because of particularly aggravated misconduct by a defendant. Dobbs at § 3.9. For this reason, a consideration of offsetting benefits would be inappropriate. In determining what aggravated misconduct will justify a punitive award, courts usually look at the defendant's mental state rather than his outward conduct. The kind of mental state required has been variously referred to as malicious, reckless, oppressive, evil, wicked, wanton, or morally culpable. Almost any term that describes misconduct with a bad state of mind describes a case for a punitive award, whereas anything that negates a bad state

of mind will usually preclude an award of punitive damages, as where the defendant is found to have acted in good faith, or on advice of counsel. *Id.*

■■■ The law in Georgia follows these general principles on punitive damages. To authorize punitive damages there must be evidence of wilful misconduct, malice, fraud, wantonness, or oppression, or that entire want of care which would raise a presumption of a conscious indifference to the consequences. *Kicklighter v. Nails by Jannee, Inc.,* 616 F.2d 734 (5th Cir. 1980). *See also In re Willis,* 2 B.R. 566 (1980); *Gordon v. Ogden,* 154 Ga.App. 641, 269 S.E.2d 499 (1980); Georgia Code Ann. § 105–2002 (1968). In addition, when the theory of recovery is for breach of contract, exemplary damages can never be allowed. Georgia Code Ann. § 20–1405 (1977); *Hospital Authority of Charlton County v. Bryant,* 157 Ga.App. 330, 277 S.E.2d 322 (1981); *Pelletier v. Schultz,* 157 Ga.App. 64, 276 S.E.2d 118 (1981); *Nestle Co., Inc. v. J. H. Ewing and Sons,* 153 Ga.App. 328, 265 S.E.2d 61 (1981).

■■■■■ Applying the above-stated principles to the present case, it is evident that the Authority is not entitled to punitive damages against either defendant. The general prohibition against such an award in actions for breach of contract is sufficient to bar the plaintiff's recovery against TWC. Neither are punitive damages justifiable in the plaintiff's claim against Zurn of tortious interference. Its bare assertions notwithstanding, the Authority has pointed to no actions by Zurn which rise to such a level, or sink to such depths, that they could be referred to as "evil", "wicked", "malicious", etc. The evidence submitted shows serious negotiations among all of the parties, with several proposals and counterproposals being exchanged. Even assuming conduct sufficient to find a tortious interference by Zurn, there is not that additional evidence of a desire to "sabotage" the negotiations or some similar conduct which would suggest a state of mind such that an award of punitive damages would be appropriate. To the contrary, the evidence suggests that there was always that desire on the part of all concerned to contract, albeit to differing terms. Accordingly, it is the court's best judgment that plaintiff is not entitled to punitive damages against the defendants.

#### (5) Attorneys Fees

■■■ "The general rule, apart from statute, is that the prevailing party in litigation is not entitled to recover any sum for his attorneys' fees." Dobbs at § 3.8. In spite of this rule, however, attorneys fees are awardable where a specific statute so provides or where a valid contract between the parties provides for such fees. Plaintiff in the instant case makes a claim to attorneys fees under both of these exceptions to the general rule. The statute relied on by the Authority is Georgia Code Ann. § 20–1404 (1977): "The expenses of litigation are not generally allowed as a part of the damages; but if the defendant has acted in bad faith, or has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." The plaintiff contends that both of the defendants have engaged in this proscribed conduct thus entitling it to its attorneys fees. Additionally, as to defendant TWC, the plaintiff alleges a right to recovery of attorneys fees because of the provision therefor in the Contract Documents which states as follows:

> "Should either party to the Contract default in the performance of the provisions of this Contract and should the other party employ an attorney to enforce any provision hereof or to collect damages for breach of contract, such reasonable attorney's fee as may be expended (but not in excess of 15% of the amount involved), shall be paid by the defaulting party.

Having given the notice required by Georgia Code Ann. § 20–506 (1977), the Authority contends that this contract provision entitles it to its attorneys fees as against TWC.

■■■ As to the plaintiff's statutory claim for damages, there is no conduct in

the instant case · which amounts to bad faith, stubborn litigiousness or which has caused the plaintiff unnecessary trouble and expense. Bad faith, as used in § 20–1404, relates to the time prior to institution of the action; specifically, it is that fraud or bad faith of a defendant in the transaction out of which the cause of action arose. *Bankers Health and Life Insurance Co. v. Plumer*, 67 Ga.App. 720, 21 S.E.2d 515 (1942). Although the parties in the instant case were in constant disagreement as to certain terms and conditions of their contractual relationship, this disagreement is not sufficient to evidence any bad faith.

 Nor is there evidence that the defendants have been stubbornly litigious. This phrase should not be used to refer to the act of merely defending on claims brought by another. In addition, the defendants cannot be held stubbornly litigious here because there exists a bona fide controversy which precludes such a finding. "Where there is a bona fide controversy for the tribunals to settle, and the parties cannot adjust it amicably, there should be no burdening of one with the counsel fees of the other, unless there has been wanton or excessive indulgence in litigation." *Tift v. Towns*, 63 Ga. 237, 242, cited in *Buffalo Cab Co. v. Williams*, 126 Ga.App. 522, 524, 191 S.E.2d 317 (1972). *See also, Vacca v. Meetze*, 499 F.Supp. 1089, 1091 (S.D.Ga. 1980). Based on the above, the court finds no legitimate basis for awarding attorneys fees under § 20–1404.

 Though attorneys fees are not awardable statutorily, plaintiff's attorney is entitled to "such reasonable attorneys' fees" as contemplated in General Condition 20 of the contract quoted above, assuming a valid contract existed. Though in the nature of a liquidated damages provision, a contractual provision calling for an award of attorneys fees has an important distinction. Attorneys fees, when awarded, are not aimed at compensating for harm done by a defendant's actionable conduct. Though an award may operate as reparation for expenses incurred, it is *not* based upon losses caused by actionable conduct; rather, it is only based on those losses caused by the litigation itself. Dobbs, p. ____.

 This distinction is important and controlling in the present case. Whereas allowing the compensatory liquidated damages under the present circumstances might result in a windfall to the Authority, given the fact that there were substantial offsetting benefits derived from the defendants' alleged breach (see discussion, *supra*), there would be no such windfall in allowing the reasonable attorneys fees requested. Furthermore, the concept of offsetting benefits is inapplicable here because, as stated above, an award of attorneys fees is not *per se* related to the actionable conduct of the defendant and the necessary weighing of benefits and burdens related thereto.

 Accordingly, the court determines that if, as assumed for present purposes, there was a valid contract in existence, then the plaintiff is entitled to those "reasonable attorneys' fee(s)" contemplated in General Condition 20 of that contract with defendant TWC. Although the Authority claims that this amount is $58,817.51, and offers a breakdown of these expenses in answer to defendant Zurn's first set of interrogatories, the court presently makes no determination as to the exact amount awardable, such a determination being dependent upon a finding that the parties had entered a legally enforceable contract.

## (6) Delay Costs

At the September 19, 1980, pretrial conference the court questioned whether there might not be some damages resulting from the delay and, if so, whether or not the plaintiff could recover them. The parties were instructed to consider this element of damages in their briefs. In reviewing the submitted briefs the court finds that the question of delay costs was not analyzed as extensively as other possible elements of damages, and few citations were offered either in support of or opposition to considering these costs as recoverable damages.

It is not necessary, however, to consider whether the plaintiff is entitled to delay

damages based on the case law alone, because these damages were contemplated by the Authority and defendant TWC in their contractual relations. In General Condition 27 the following language appears:

"The Contract time shall begin on a date specified in the Notice to Proceed issued by the Engineer. The Contractor will proceed with the work at a rate of progress which will insure completion within the contract time. It is expressly understood and agreed by and between the Contractor and the Owner, that the contract time for the completion of the work described herein is a reasonable time, taking into consideration the average climatic and economic conditions and other factors prevailing in the locality of the work.

"If the Contractor shall fail to complete the work within the contract time, or extended contract time if authorized by change orders, then the Contractor will pay to the Owner the amount of liquidated damages specified in the Contract Documents for each calendar day that the Contractor shall be in default after the time stipulated in the Contract Documents."

██ In the Contract Agreement signed by the Authority and TWC but undated, the "reasonable time" referred to in the General Condition is defined and an amount is stated as liquidated damages for a delay beyond that period:

"The Contractor shall commence the work to be performed under this Agreement on a date to be specified in a written order of the Owner's Engineer and shall fully complete all work hereunder within 540 consecutive calendar days from above time limit. Time is of the essence in this Contract, and the Contractor shall pay to the Owner, not as a penalty, but as liquidated damages, the sum of Two Hundred Fifty Dollars ($250.00) for each calendar day that he shall be in default of completing the work within the time limit named herein. Because of the difficulty of fixing damages suffered by the Owner on account of such default, damages are herein agreed upon as stated."

On May 21, 1979, the engineers for the project sent a Notice to Proceed to defendant TWC which was effective on June 4, 1979. Counting forward 540 consecutive days from this date, the completion date was listed as November 25, 1980 (Zurn's Composite Exhibit of Documentary Evidence at p. 222).

Based on the above information, and based on the assumption that there is a valid contract between the Authority and TWC, it is evident that the plaintiff would be entitled to liquidated damages of $250.00 per day for each day beyond November 25, 1980, that the project remained incomplete. However, until a computation of delay costs using this information has been submitted, the court cannot say what amount of the damages the plaintiff is entitled to recover.

## SUMMARY

(1) Regardless of whether or not a valid contract existed, the plaintiff is not entitled to damages in an amount equal to the difference in bids, to liquidated damages under Paragraph 7 of the contract, or to any punitive damages; therefore, the defendants' motions for summary judgment as to these elements of damages is GRANTED.

(2) Although the court finds that the plaintiff is entitled to attorneys fees and damages for delay as contemplated in the contract, judgment cannot be granted on these damages until there is a determination that the contract, assumed valid for purposes of the consideration of damages, is indeed an enforceable contract.

(3) Finally, judgment cannot be granted in favor of the Authority on its claim for engineering fees until a determination is made as to the existence of a valid contract and as to whether the annual operating expenses saved over the life of the project will exceed these requested expenses.

This court will, pursuant to Rule 56(d), set a date for further proceedings on the remaining issues in this case.