**LOUISIANA SULPHUR CARRIERS, INC., Plaintiff,**

v.

**GULF RESOURCES AND CHEMICAL CORPORATION, Defendant.**

**Civ. A. No. 3982.**

United States District Court,
D. Delaware.

Nov. 2, 1971.

Robert H. Richards, III, of Richards, Layton & Finger, Wilmington, Del., Robert B. Fiske, Jr., and William H. Levit, Jr., of Davis, Polk & Wardwell, New York City, for plaintiff.

Andrew B. Kirkpatrick, Jr., and Joseph C. Kelly, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant.

## OPINION

CALEB M. WRIGHT, Chief Judge.

This is an action brought by Louisiana Sulphur Carriers, Inc. ("Louisiana") against Gulf Resources and Chemical Corporation ("Gulf") for approximately $311,000 allegedly owing Louisiana under a Transportation Contract between the parties entered into June 28, 1968. The case is presently before the Court on the plaintiff's motion to strike the defendant's fourth affirmative defense pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.

Louisiana is a Delaware corporation established for the purpose of chartering the vessel "S. S. Louisiana Sulphur" ("Vessel"), subject matter of this litigation.

Gulf is a Delaware corporation engaged in mining and refining coal, various non-ferrous metal and other ores. As of June 28, 1968, Gulf was involved in the mining and production of sulphur in Mexico.

The precise meaning and import to be ascribed to the terms of the Louisiana-Gulf Transportation Contracts ("Contract") is strongly contested by the parties; however, these numerous conflicts need not be resolved on this motion.[1] In essence, the Contract provided for Gulf's use of the Vessel to ship sulphur between Coatzacoalcos, Mexico and various United States Gulf and East coast ports. Under the Contract, the Vessel was available to Gulf only when it was not being used by Freeport Sulphur Company ("Freeport"). The Contract was for eight years terminable upon one year's notice, and delineated certain variable daily freight charges to be paid by Gulf depending upon the manner in which the Vessel was employed.[2]

On December 30, 1969, Gulf gave the requisite notice of termination and cancellation, and ceased to make payments under the Contract. The plaintiff seeks herein to recover the monies allegedly owing during the year subsequent to the termination notice.

1. The parties contest the meaning and import of section nine of the Contract dealing with "Excuses for Non-performance." Under the *force majeure* theory, Gulf alleges that the acts of the Mexican government relieve it from liability for the Contract payments. Louisiana disputes this position.

2. Section 5.1 of the Contract defines and sets the rates for the various uses of the Vessel. Operating day—$4850.00 (days Gulf using Vessel other than other three categories) ; Idle day—$3840.00 (days Gulf using Vessel in port—except first 24 hrs) ; Lay-up day—$1,000.00 (after 1-20-69—$1,200.00) (Vessel in port in lay-up status) ; Make-ready day—$6810.-00 ($7810.00 after 1-20-69) (each day Vessel taken out of or returned to lay-up status).

Gulf has denied the material allegations of the complaint and asserts four affirmative defenses to the Louisiana claim. The first two are based upon two clauses of the Contract and allege that Gulf is not liable because of acts of the Mexican government, the *force majeure* defense.[3] The third, raised as a partial defense, is that Louisiana failed to mitigate damages. Gulf's fourth affirmative defense, subject of this motion to strike, states:

> Plaintiff has not been damaged in that, as a result of the prospect of and the fact of defendant's subsidiary being forced to shut down its sulphur producing operations in Mexico and therefore being forced to cease all shipments of liquid sulphur and to cease use of the Vessel, plaintiff directly or indirectly through its affiliate Freeport Sulphur Company profited to an extent which may be greater than the damages here claimed by being able to make sales of sulphur which would otherwise have been made by defendant. (Amended Answer, ¶ 21).

Gulf claims that this fourth defense was raised in response to the position taken by Louisiana concerning its mitigation defense. Louisiana is alleged to have asserted that it and Freeport were one and the same, and that it did not have to mitigate damages since to do so would be disadvantageous to Freeport's competitive situation in the sulphur field. Gulf states that if Freeport's sulphur business and the Freeport-Louisiana relationship are relevant regarding mitigation then they are sufficient to sustain the fourth defense. Basing its defense on the general theory that a defendant is to be credited with any advantages to plaintiff which would not

have been available had the Contract been performed, Gulf seeks to initiate discovery proceedings to ascertain the volume of and reasons for Freeport sulphur sales subsequent to the Contract's termination. Louisiana's present motion is in response to and an attempt to avoid this additional issue.

Motions to strike a defense as legally insufficient are not favored and will not ordinarily be granted unless the insufficiency is "clearly apparent", 1A Barron and Holtzoff, Federal Practice and Procedure, § 368, p. 5016 (1960). Not favored because of their dilatory character and tendency to create piecemeal litigation, motions to strike are often denied even when technically correct and well-founded. Wright and Miller, Federal Practice and Procedure, § 1381 pp. 799–800 (1969); 2A Moore Federal Practice, ¶ 12.21[2]. Thus, absent a showing of prejudice, courts are often reluctant to decide disputed and substantial questions of law. *Id.* However, defenses which would tend to significantly complicate the litigation are particularly vulnerable to a motion to strike. *Id.* The Court is of the opinion that the fourth defense would substantially complicate the discovery proceedings and the issues at trial and that the defense is legally insufficient under any facts alleged herein. It, therefore, grants Louisiana's Motion to Strike.

Gulf asserts that if Freeport and Louisiana are affiliated then any profits which Freeport made on sulphur sales directly attributable to Gulf's termination of the Contract must be offset against the damages Louisiana suffered as a result of the termination. Gulf contends that the general theory of contract damages, putting the plaintiff in the position he would have been had the

---

3. See footnote 1. Section 9 reads in pertinent part:

"9. *Excuses for Nonperformance.* Neither party shall be liable for failure to perform any obligation hereunder (except the obligations of Gulf to make payments hereunder * * *) in the event and to the extent that such performance is prevented or delayed by * * * acts of any governmental authority. * * *"

defendant performed, makes requisite crediting Gulf with any Freeport profits. Thus, Gulf argues that if the Contract had been fulfilled, i. e., Gulf had shipped sulphur to its own customers, then Freeport would not have been able to make some of the sales of sulphur it made subsequent to Gulf's breach. Since the Contract provided for Gulf's use of the Vessel for shipping sulphur, Freeport sales and profits which would have been Gulf's had the Contract been performed must be credited to Gulf to satisfy the "but for" nature of the damages test.

Louisiana raises two arguments against this attempted set-off. First, Louisiana states that regardless of the breadth of Gulf's theory, Freeport sulphur profits should not be off-set against the Contract damages. Under the Contract, it asserts Gulf's only obligation was to pay money, and Gulf could have performed this obligation without affecting Freeport's sales. Therefore, since pursuant to paragraph 7.1 of the Louisiana-Freeport Contract, Freeport was entitled to all monies earned for subletting the Vessel, the only consequence of Gulf's breach was that Freeport had less money available for use in its sulphur business. Had Gulf not breached, Louisiana contends that Freeport could only have been in a better competitive position. This characterization of Gulf's obligation may be accurate, however, Louisiana's attempt to segment the Contract and discuss solely the impact of Gulf's performance misconstrues the "off-set" theory. The phrases, "had the defendant performed" or "had the Contract not been breached", require an assessment of the situation had both sides of the Contract been fulfilled. Had Gulf shipped sulphur to its customers then Freeport would not have made the profits Gulf seeks to off-set through the fourth defense.

Louisiana counters this contention by arguing that the Contract calls for payments for "Idle Days", and that the ship could, and in fact did, remain idle without affecting Freeport sales. The Court is of the opinion that this argument also misconstrues the emphasis of the off-set theory. Certainly the underlying reason for the Gulf-Louisiana agreement was to provide the former with a means to transport its sulphur. The off-set doctrine presupposes a fulfillment of the Contract's entire purpose and not some subsidiary component.

Secondly, Louisiana contends that the Contract damages theory upon which Gulf relies is much narrower than Gulf claims, and would not require off-setting profits in one business, i. e., sulphur sales, against damages in another, i. e., shipleasing.

▮▮▮▮ The Court agrees with this second contention and rejects Gulf's characterization of the off-set theory since none of the cases or authorities cited by Gulf support an off-set of Freeport's profits against Louisiana's damages. *Gulf places great reliance on the proposition set forth by McCormick on Damages § 40:*

> Where the defendant's wrong or breach of contract has not only caused damage, but has also conferred a benefit upon the plaintiff (such as saving of expense of performance or making available an opportunity to dispose of goods or services) which he would not otherwise have reaped, the value of this benefit must be credited to defendant in assessing the damages.

See also Restatement of Contracts § 336 Comment (c) p. 537 (1932) and 25 C.J. S. Damages § 97 (1966). Apparently, Gulf interprets the section literally to establish a "but for" standard for ascertaining appropriate set-offs. Thus, any benefits, however tangential, which can be said to be derived by a plaintiff because a contract was breached must be off-set against his damages.

■ In an economy with increasingly diversifying conglomerates, a literal application of this doctrine could greatly complicate any contract litigation and provide breaching defendants with economic windfalls which result from transactions by unrelated divisions of plaintiff's enterprise. The off-set theory under discussion cannot be construed literally. It can only be utilized when the benefits accruing to the plaintiff are sufficiently proximate to the contract to warrant reducing the plaintiff's damages and the failure to do so would permit the plaintiff to obtain unreasonable damages.

None of the cases cited by Gulf nor its authorities, McCormick, et al. approach the extreme situation to which Gulf argues the off-set should be applied. The Court is unable to discern from the particularized and limited factual circumstances which have merited the employment of the off-set doctrine in prior cases some rationale which would permit Gulf to reap the benefits of the Freeport enterprise. The doctrine has been applied to reduce damages only where the nexus between the subject matter of the contract and of the plaintiff's subsequent benefits is much closer than the circumstances of this case. No case cited by Gulf involved an off-set of profits earned in one business against the damages suffered in another.

All of the cases cited by Gulf to support the off-set theory involve two basic situations: 1. The means or vehicle requisite to obtain the subsequent profits would have been unavailable had the contract been performed, and 2, the breach resulted in a direct and immediate saving to plaintiff, i. e., saving on cost of performance.

Since the posited off-set does not involve any savings on the cost of performance, the cases cited to sustain the second theory are irrelevant to this motion. See United States v. Ebinger, 386 F.2d 557 (2nd Cir. 1967).[4] The fourth affirmative defense raises issues pertinent to the first basic situation.

The typical example cited to support the "but for" rule in the first situation is the suit for damages for the refusal to employ under a personal services contract when the plaintiff has obtained substitute employment subsequent to the breach. The plaintiff's wages from the second employment are deducted from his contract damages since one cannot work two places simultaneously and "but for" the breach he could not have earned the additional wages. See—3 Williston on Contracts § 1363.[5] The subject matter of the breached contract and the vehicle of the plaintiff's subsequent profits are identical, personal services.

The same identity between the breach and the means of procuring later benefits is present in several of the cases relied upon by Gulf. See Baker Transfer Co. v. Merchants' Refrigerating and Ice Manufacturing Co., 12 App.Div. 260, 42 N.Y.S. 76 (1896); Burks v. Sinclair Refining Co., 183 F.2d 239 (3rd Cir. 1950); Wells Aircraft Parts Co. v. Allan J. Kayser Co., 118 Colo. 197, 194 P. 2d 326 (1947); Canton-Hughes Pump Co. v. Llera, 205 F. 209 (6th Cir. 1913); and DeMoss v. Beryllium Corp., 358 Pa. 470, 58 A.2d 70 (1948). In *Baker*, on the issues of damages, the court held that the defendant should have the opportunity to show that the same equipment which was necessary for plaintiff to perform its contract for the delivery of the output of the defendant's ice production plant was employed by plaintiff

---

4. *Ebinger* involved tort damages for the negligent destruction of a water tower. The court held that damages should be the cost of replacement less the savings from reduced maintenance. See also Williston, Contracts § 1350 (1920).

5. Carroll v. Cohen, 5 Boyce 233, 91 A. 1001 (Del.Super.Ct.1914); Seltzer v. City of Reading, 151 Pa.Super. 226, 30 A.2d 177 (1943).

to perform other contracts. In *Burks*, plaintiffs damages for defendant's breach of its contract to supply plaintiff's gas station must reflect any benefits accruing to plaintiff for using the same building as a residence during the term of the contract. The *DeMoss* court stated that in a suit for profits where the defendant contracted to use all of the plaintiffs output, damages must be reduced by the amount of subsequent sales by plaintiff in the period during which the contract was to be in force. The other two cases involve crediting the defendant with profits accruing to plaintiff through the very instrumentalities which were the subject matter of the breached contract.[6] Thus, where a plaintiff is unable to undertake both contracts because the pecularities of the contract or the inadequacies of its productive capabilities preclude completing both, the defendant is credited with the second profit. To analogize to the instant case, any profits made through leasing the Vessel during the period for which Gulf is being charged would be deducted from Louisiana's damages. The above cases, premised upon the impossibility of dual performances, do not support the extension of the off-set theory to this factual situation since the means or instrumentalities of Freeport's sulphur profits, its production and distribution equipment, are totally separate and unrelated to the performance of the contract and the availability of the Vessel.

In situations where the plaintiff's ability to produce or supply other contract's requirements would not have been precluded by performance of the breached Contract, the defendant does not generally receive the benefit of profits on subsequent transactions. See generally McCormick on Damages § 41. Manufacturing, mining, and construction contracts are typical areas where the plaintiff receives damages in spite of subsequent sales.[7] While the defendant has attempted to characterize these as exceptions to the general rule, this is an area where the exceptions are rapidly becoming the rule, and the rule is being circumscribed to rather narrow and specifically delineated fact situations. Freeport's ability to produce and transport sulphur was not contingent upon the use of the Vessel.

By couching its claim in terms of the demand for sulphur, or the availability of markets, Gulf has attempted to avoid the thrust of the above cases. Thus, Gulf stated that had it fulfilled the Contract and supplied its customers, Freeport could not have done so. Gulf has cited no cases allowing an off-set where the market for plaintiff's subsequent profits would not have been available had the Contract been performed. Since the absence of customers is the basic factual contention behind the fourth affirmative defense, authorities dealing with such claims would be most relevant. Louisiana has cited two such cases. See *Olds v. Mapes-Reeve Const. Co.*, 177 Mass. 41, 58 N.E. 478 (1900); and *Grinnell Co., Inc. v. Voorhees*, 1 F.2d 693 (3rd Cir. 1924), cert. denied 266 U. S. 629, 45 S.Ct. 195, 69 L.Ed. 477 (1924). In both cases, the courts

---

6. Two other New York cases stating the rule are: J. K. Rishel Furniture Co. v. Stuyvesant Co., 123 Misc. 208, 204 N.Y.S. 659 (N.Y.Mun.1924) (advertising space— if limited by page or location then substitute profits are off-set, however if no limit on pages, etc., then no off-set for other new advertisements); United Merchants' Realty & Improvement Co. v. American Billposting Co., 71 Misc. 457, 128 N.Y.S. 666 (bill board poster space— off-set if same space re-rented.)

7. Construction—Olds v. Mapes-Reeve Const. Co., 177 Mass. 41, 58 N.E. 478 (1900).
Mining—Hughes v. Chesapeake & Ohio Coal & Coke Co., 269 F. 589 (3rd Cir. 1921).
Manufacturing—Willred Co. v. Westmoreland Metal Mfg. Co., 200 F.Supp. 59 (E.D.Pa.1961).

refused to allow the defendants to off-set the profits which plaintiff made on contracts with third parties to perform the same work which would have been completed had the defendant initially fulfilled the contract. These cases demonstrate that Gulf's "but for" analysis is erroneous and that certain benefits accruing to the non-breaching plaintiff through separate transactions will not be deducted from the defendant's liability. Further, the factual situation in *Grinnell* and *Olds* is, certainly more favorable to Gulf's theory than the circumstances here. There, the same parties were performing the identical work they would have béen required to do in the initial contract; whereas here, the initial contract involved the provision of transportation for another's product and the subsequent profits were for sales of one's own products.

Gulf has argued that *Olds* and *Grinnell* are irrelevant since they are not New York cases and this contract is governed by New York law. Nonetheless, the cases embody the only cited response to Gulf's theory extending the off-set doctrine to fact situations where the defendant alleges that had he performed, there would have been no market demand for plaintiffs subsequent undertaking.

Obviously, the concept of off-setting plaintiff's profits from one transaction against its damages in another embodies an effort to balance a plaintiff's strict contractual rights with a realistic approximation of its reasonable earnings. Therefore, when plaintiff's capacities or capabilities preclude two profits, the defendant obtains the benefit of the second transaction. However, the effort to mollify the breaching defendant's liability has not been extended to the extreme that Gulf suggests. Freeport's profits on sulphur sales are not sufficiently proximate to the breach to permit the off-set postulated in the fourth affirmative defense. Were it not for the substantial discovery requisite to prepara-tion for this defense and the undoubted complication of the issues at trial, it would not be necessary to strike the defense in spite of its evident inadequacy as a matter of law. However, the above factors in combination are sufficient to convince this Court that Louisiana's Motion to Strike Gulf's Fourth Affirmative Defense should be, and therefore, is granted.

Submit order in accordance herewith.