**Lyle TATUM et al., Plaintiffs,**

v.

**Rogers C. B. MORTON et al., Defendants.**

**Civ. A. No. 398–72.**

United States District Court, District of Columbia.

March 13, 1974.

James M. Johnstone and William A. Anawaty, Washington, D. C., for plaintiffs.

Edward L. Curry, Asst. Corp. Counsel, Washington, D. C., for defendants.

## MEMORANDUM

GASCH, District Judge.

This matter is before the Court on defendants' motion for summary judgment and plaintiffs' cross-motion for partial summary judgment. Plaintiffs seek money damages against District of Columbia Police Chief Jerry V. Wilson and Inspector William Trussell also of the Metropolitan Police Department as well as the District of Columbia.[1] The relevant facts which are essentially undisputed by each side are set forth below.

### I.

Plaintiffs, who were participating in a "vigil" near the White House, were arrested for failure to disperse after the establishment of a police line around their gathering on Sunday, April 25, 1971, on the sidewalk on the south side of Pennsylvania Avenue, N. W., between East Executive Avenue and West Executive Avenue.[2] The basic tenor of this

---

1. Plaintiffs have also asked this Court to declare Article 6, Section 5(a), of the Police Regulations of the District of Columbia void in light of its irreparable vagueness. This regulation embodies the criteria under which "police lines" may be established in the District of Columbia and for the violation of which plaintiffs were arrested. A police line may be established if circumstances require a clearing for:

    (1) the operation of firemen or policemen;

    (2) the passage of a parade;

    (3) the movement of traffic;

    (4) the exclusion of the public from the vicinity of a riot, disorderly gathering, accident, wreck, explosion, or other emergency; and

    (5) the protection of persons and property.
It was the rationale of number five which was utilized by the police in the establishment of police lines on April 25. The enjoining of this regulation was not raised in the original complaint except tangentially. Subsequently, however, a second complaint entitled *Tatum v. Wilson*, Civil Action No. 2108–73, has squarely challenged this regulation on constitutional grounds. It is the belief of this Court that the enjoining of the police line ordinance is more appropriately before the Court in Civil Action No. 2108–73, and the Court will reserve judgment on that question until that litigation is in a proper posture for decision.

2. This area is designated the "White House sidewalk" under 36 C.F.R. § 50.19. Under Special Order No. 11, Series 1971, of the Metropolitan Police Department (April 19, 1971), this area is within the scope of responsibility of the Metropolitan Police Department although the White House sidewalk is ordinarily administered by the Department

demonstration was peaceful[3] and there was no evidence of the open use of narcotics or alcoholic beverages.[4] More significantly, there was no observation of any destruction of property or the blocking of the passage of pedestrians on the sidewalk.[5]

The gist of plaintiffs' case[6] is their challenge to the validity and reasonableness of the judgment of Inspector Trussell that although this Quaker gathering was peaceful for the moment, he concluded there was justification for establishing police lines due to the imminent danger of property damage and personal injury created by the influx of "outsiders" into the vigil lines. Inspector Trussell gave the following statement as to his view of the outsiders:

Well, for the most part they were very dirty, mostly carrying knapsacks. Obviously, they were the people I had observed down on the Monument grounds. By this time those numbers that I spoke about earlier who had slept in on the Monument grounds were leaving by various means and directions, most hitchhiking. Many of them came north on 17th Street and went east on Pennsylvania Avenue and continued out New York Avenue exiting from Washington.

Many of them appeared to be lost, bewildered and really sort of no strings attached. As I say, it was obvious they slept out not only for one night but for periods of time and didn't at all resemble the people who came and identified themselves to be the Quaker Peace Action Group. And they were rather loud and boisterous. And when they would join the line they called to all their type to come and join, and things of that nature.

And it was visually apparent that they were not with the original group. And it was visually apparent where they had come from.[7]

It was Inspector Trussell's belief, therefore, that these "outsiders" were from the group that he had observed the night before on the grounds of the Washington Monument. The scene on the Monument grounds can best be described by Inspector Trussell's own words:

There had been a great deal of property damage down there during the night. A lot of the people had slept there. A lot of them were still sleeping as dawn broke. There were a great number of vehicles parked all over the grass, camp fires were burning and benches had been torn up and set fire to, the

---

of Interior. At one time the Interior Department, through regulation, 36 C.F.R. § 50.19, had placed a 100 person limitation to demonstrations on this sidewalk. However, on June 24, 1969, the United States Court of Appeals for this District upheld a District Court preliminary injunction against the enforcement of this 100 person limitation. *Quaker Action Group v. Hickel,* 137 U.S.App. D.C. 176, 421 F.2d 1111 (1969). As a result, at the time of the arrests at issue in this case, there was in effect an injunction forbidding the enforcement of this numerical limitation.

3. The officer who ordered the establishment of police lines was Inspector William C. Trussell. During deposition testimony, Inspector Trussell stated in regard to the "vigil": "They were apparently a law abiding group and there was no indication there would be any police problems at all really." Deposition of William C. Trussell at 25 (hereinafter referred to as Trussell Deposition). *See also*

Deposition of Deputy Chief Mahlon E. Pitts at 37 (did not see any violations of the law prior to the establishment of the police lines); Deposition of Sergeant Larry L. Brillhart at 10 (did not see any violation of the law before the establishment of police lines); Deposition of Officer Herbert G. Reisse at 8 (saw no violence or destruction of property, drinking of alcoholic beverages or possession of any weapons before establishment of police lines). Deposition of Peter Raynor at 52–53.

4. Trussell Deposition at 33.

5. *Id.* at 33–34. Additionally, Inspector Trussell did not observe any member of the vigil carrying a weapon. *Id. See also* note 3, *supra.*

6. It is significant that all charges against plaintiffs were subsequently dropped.

7. Trussell Deposition at 39–40.

flags torn down, the place pretty well resembled a battlefield with a whole lot of wounded warriors still around, so naturally that was the only thing of a police nature going on.

I stayed very close to that and monitored it.[8]

Based upon the similarity of appearance and the direction from which these persons aproached, Inspector Trussell concluded that there might very well be the same type of destruction of property near the White House that occurred at the Monument. This he believed warranted the establishment of police lines. However, Inspector Trussell saw no "outsider" commit any violation of the law nor destroy any property.[9] Furthermore, when asked whether he could · identify any of these "outsiders" as being persons whom he had seen destroying property on the Monument grounds, he answered in the negative.[10] The Inspector could only speculate based on his judgment as to all the surrounding circumstances, that these were persons from the group that had spent the night on the Monument grounds.

The questions with which this Court is faced, therefore, are: (1) whether the actions taken by Inspector Trussell were of such a nature in light of all the circumstances to warrant his legal liability; (2) whether the District of Columbia is liable for the actions of its employee, Inspector Trussell, under the theory of *respondeat superior;* and (3) whether Police Chief Jerry V. Wilson is liable for the misuse of the police line ordinance and his alleged failure to promulgate and monitor the effectiveness of guidelines in connection with the police line ordinance.

## II.

■■ It is clear that the plaintiffs in this action were exercising their First Amendment rights and any interference with those rights must be subject to strict judicial scrutiny. *See New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1970); *Carroll v. President and Commissioners of Princess Anne,* 393 U.S. 175, 181, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *A Quaker Action Group v. Hickel,* 137 U.S.App.D.C. 176, 182, 421 F.2d 1111, 1117 (1969); *Gregory v. City of Chicago,* 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969). However, where there is a threat of violence or the abuse of First Amendment rights, the maintenance of the public interest and safety must in certain cases override the right to exercise those First Amendment rights. *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *Schenck v. United States,* 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470 (1919). Upon careful review of the record, the law, and the surrounding circumstances of this case, it is clear to this Court that this was not a case where the authorities were justified in interfering with the exercise of First Amendment rights.

Judging Inspector Trussell's conduct "from the viewpoint of a prudent and cautious police officer on the scene at the time of the arrest" and "guided by the whole of his police experience," *Jackson v. United States,* 112 U.S.App.D.C. 260, 262, 302 F.2d 194, 196 (1962), it is apparent that the only rationale for Inspector Trussell's belief that there might be destruction of property or personal injury was the simple fact that the "outsiders" who joined the vigil had the same appearance as persons who were present at the Monument grounds when *unknown* persons destroyed property. The record indicates that there was no other evidence to suggest the possibility of violence or property damage at the scene of the gathering.

Defendants raise the defense of the reasonableness of Inspector Trussell's actions. That defense was best described

8. *Id.* at 14.

9. *Id.* at 40.

10. *Id.*

in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 456 F.2d 1339, 1347–48 (2d Cir. 1972).

At common law the police officer always had available to him the defense of good faith and probable cause, and this has been consistently read as meaning good faith and "reasonable belief" in the validity of the arrest or search. . . . Similarly, the use of force is not privileged if in excess of that which the actor "reasonably believes to be necessary." [Citations omitted.]

\* \* \* \* \* \*

Therefore, to prevail the police officer need not allege and prove probable cause in the constitutional sense. The standard governing police conduct is composed of two elements, the first is subjective and the second is objective. Thus the officer must allege and prove not only that he believed, in good faith, that his conduct was lawful, but also that his belief was reasonable. And so we hold that it is a defense to allege and prove good faith and reasonable belief in the validity of the arrest and search and in the necessity for carrying out the arrest and search in the way the arrest was made and the search was conducted. We think, as a matter of constitutional law and as a matter of common sense, a law enforcement officer is entitled to this protection.

However, as a matter of law, based upon the undisputed facts of this case, this Court is unable to find that Inspector Trussell acted with a reasonable belief of impending violence such as to necessitate the imposition of police lines.

There are two cases that lead this Court to the conclusion that Inspector Trussell did indeed go beyond the permissible limits of the law through his arrest of these demonstrators. In *Gregory v. City of Chicago*, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969), the plaintiffs were involved in a "peaceful and orderly procession from city hall to the Mayor's residence to press their claims for desegregation of the public schools" (394 U.S. at 111, 89 S.Ct. at 947). During the course of the march, which the Supreme Court noted was in a completely lawful fashion, the onlookers became unruly. Consequently, the Chicago police, concluding that there was the chance of a civil disorder, demanded that the marchers disperse; those marchers disobeying this order were arrested. Although speaking to the question of the overturning of the convictions for disorderly conduct, the Court stated that "Petitioners' march, if peaceful and orderly, falls well within the sphere of conduct protected by the First Amendment." 394 U.S. at 112, 89 S.Ct. at 947. This language appears equally applicable to the factual situation of the case at bar. This peaceful gathering was as clearly within the protections afforded by the First Amendment as the march in the *Gregory* decision and it follows that the violation of constitutional rights without sufficient cause gives rise to the liability of the arresting oficer.[11]

The second authority which leads the Court to find Inspector Trussell's conduct violated First Amendment rights is *Nesmith v. Alford*, 318 F.2d 110 (5th Cir. 1963), *cert. denied*, 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420 (1964). The plaintiffs in *Nesmith* sued the police commissioner, the police chief and others for false imprisonment, malicious prosecution and the violation of civil rights. Plaintiffs' complaint was grounded on their arrest while eating in a Montgomery, Alabama, cafe. The group, including both blacks and whites, drew much attention from passersby due to the racial mixture of the diners even though they were simply having lunch and engaging in a discussion. At no time were there any indications of violence from inside the cafe. 318 F.2d at 119. The crowd outside the cafe grew to between 50 to 150 persons, mostly blacks, and the streets became congested with cars con-

---

11. *See* note 13, *infra*.

taining white persons. As a result, the police, concluding there might be violence, entered the cafe and arrested the plaintiffs. The Court of Appeals for the Fifth Circuit found, *inter alia*, that there had been no breach of the peace and the only possible threat of disturbance was from the crowd that had gathered outside the cafe. In holding the police officers liable for the arrests, the Court stated:

> We may credit the concern which these police officers testified they felt. We think the circumstances existing that day and their stated good faith apprehensions were admissible as bearing upon the question of punitive, though not compensatory, damages. But liberty is at an end if a police officer may without warrant arrest, not the person threatening violence, but those who are its likely victims merely because the person arrested is engaging in conduct which, though peaceful and legally and constitutionally protected, is deemed offensive and provocative to settled social customs and practices. When that day comes, freedom of the press, freedom of assembly, freedom of speech, freedom of religion will all be imperiled. For the exercise of each must then conform to what the conscientious policeman regards the community's threshold of intolerance to be. . . .

318 F.2d at 120–121.

In the principal case, the role of the conscientious policeman is once again called into question. The Alabama police, it may be noted, acted with what could be considered more probable cause than that of Inspector Trussell in light of the possibility of racial confrontation. But the *Nesmith* Court held the police liable for violation of plaintiffs' rights nevertheless. This Court in this analogous factual pattern finds that plaintiffs' peaceful gathering was constitutionally protected conduct that could not be the subject of infringement without a more rational basis than is submitted to the Court by the defendants. Whether it be a threat of violence from a crowd viewing the exercise of First Amendment rights or a possibility of violence from outsiders who may join such a demonstration, the police may not act in the derogation of First Amendment rights except in circumstances where the public safety is so in need of protection that an interference with First Amendment rights is warranted. As noted previously upon a review of the record, there was no suggestion of violence in this case that would warrant such an interference.[12] *See also Cox v. Louisiana*, 379 U.S. 536, 550–51, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); *cf. Carroll v. President and Commission-*

12. The estimates of the size of the vigil at the time police lines were established ranged from 200–300 persons. It has been held that this sidewalk can hold up to 750 persons without the demonstration spilling into the street or blocking pedestrian passage or injuring any governmental interest in protecting the President or the White House. *A Quaker Action Group v. Morton*, 362 F.Supp. 1161, 1172 (D.D.C.1973). Therefore, without any further evidence of possible violence or destruction of property, the factor of crowd size could not under the circumstances shown here provide a rational basis for the establishment of police lines. *See also Gregory v. City of Chicago, supra; Cox v. Louisiana*, 379 U.S. 536, 550–51, 85 S.Ct. 453, 13 L.Ed. 2d 471 (1965); *Nesmith v. Alford*, 318 F.2d 110, 119–20 (5th Cir. 1963), *cert. denied*, 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420 (1964).

There has been some controversy in this case as to whether there was a voluntary agreement between the Quaker group and the Department of Interior to limit the size of the vigil to 100 persons. This question appears to be irrelevant to the crux of this case which is whether there was sufficient reason to utilize such a law enforcement method as a police line in connection with what was at all times a peaceful demonstration. Even assuming, *arguendo*, that the Quakers had agreed to limit the vigil to 100 persons with full cognizance of the import of this agreement, a question which is surrounded still with considerable doubt, it is the finding of this Court that the breach of this 100 person limitation agreement was not sufficient cause for the establishment of a police line which in this instance was for the alleged purpose of protecting persons or property from the dangerous propensities of the "outsiders."

*ers of Princess Anne, supra,* 393 U.S. at 180–81, 89 S.Ct. 347.

■ Accordingly, it is the finding of the Court that Inspector Trussell must be held individually liable for the unlawful and unreasonable arrests of the plaintiffs in this case.[13]

### III.

■ In regard to the liability of the District of Columbia for the torts of its employee, the Court notes that the District of Columbia has not alleged that Inspector Trussell was operating outside the scope of his employment. It is clear that Inspector Trussell was operating within the scope of his duties as senior police officer at the scene of the arrests. Therefore, under the holdings of *Graves v. District of Columbia,* D.C.App., 287 A.2d 524 (1972), *affirmed en banc sub nom., Wade v. District of Columbia,* D.C.App., 310 A.2d 857 (1973), and *Carter v. Carlson,* 144 U.S.App.D.C. 388, 447 F.2d 358 (1971), *rev'd in part on other grounds sub nom. District of Columbia v. Carter,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), the District of Columbia is liable for the actions of Inspector Trussell under the common law theory of *respondeat superior.*

### IV.

The liability of Chief Wilson for negligence in guidance and training is a matter which, based upon the record as it is now constituted, is still open to question. Discovery proceedings are still under way and plaintiffs have filed the appropriate motions to compel the information which plaintiffs have requested but which the District of Columbia has refused to provide. Therefore, the decision upon this question will be held in abeyance until the Court has ruled on the pending motions and the record is complete.

The question of the damages to be awarded to plaintiffs is a point which will require further proceedings and the Court will accordingly receive additional pleadings on this issue to assist in the determination of what constitutes appropriate damages.

---

13. The right to recover money damages against Inspector Trussell would appear to flow directly from the injuries suffered by plaintiffs as a result of the violation of their First Amendment rights as well as from their arrest without cause under the rationale of *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *Washington v. Brantley,* 352 F. Supp. 559 (M.D.Fla.1972) ; *Butler v. United States,* 365 F.Supp. 1035 (D.Hawaii, 1973) ("I agree with Plaintiffs that the irresistible logic of Bivens leads to the conclusion that damages are recoverable in a federal action under the Constitution for violations of First Amendment rights.") *See also Nesmith v. Alford, supra.*