Lyle TATUM et al., Appellants,

v.

Rogers C. B. MORTON,* Individually and in his official capacity as Secretary, Department of the Interior, et al.

No. 76–1187.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 10, 1977.

Decided Aug. 10, 1977.

As Amended Aug. 23, 1977.

* Fed.R.Civ.P. 25(d) on substitution of public officers sued in their official capacities is inapplicable to this action insofar as it only seeks damages against the officers personally.

James M. Johnstone, Washington, D. C., with whom Ralph J. Temple, Washington, D. C., was on the brief, for appellants.

Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., Barbara L. Herwig and Robert E. Kopp, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellee.

Richard W. Barton, Asst. Corp. Counsel for the District of Columbia, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Louis P. Robbins, Principal Asst. Corp. Counsel, Edward L. Curry and Leo N. Gorman, Asst. Corp. Counsels, Washington, D. C., at the time the brief was filed, were on the brief, for District of Columbia appellees.

Before WRIGHT, LEVENTHAL and WILKEY, Circuit Judges.

Opinion for the court filed by Circuit Judge LEVENTHAL.

Concurring opinion filed by Circuit Judge WILKEY.

LEVENTHAL, Circuit Judge:

This is an appeal from the ruling of the district court on plaintiffs' motion for determination of appropriate damages, expungement of arrest records and other relief.

## I. BACKGROUND

On Sunday, April 25, 1971, plaintiffs participated in a peaceful Quaker vigil of prayer on the White House sidewalk. The purpose of the vigil was "to hold Richard Nixon in the light" in the hope that the government's war policies in Vietnam would thereby be altered. The vigil had been scheduled to continue from noon until midnight. When persons thought to be "outsiders" joined the vigil, police lines were established, and the vigil participants were ordered to disperse. When the plaintiffs refused, they were arrested. The vigil was thus terminated approximately 2½ hours after its start.

Each plaintiff was arrested, photographed with the arresting officer, in accordance with standard field arrest proce-

dures, and placed on a bus for transportation to the station house. A crowd of spectators had gathered. All plaintiffs were subject to the police booking process, including fingerprinting and mug shots and, although the time span varied among individual plaintiffs, approximately three to four hours of confinement went by before any plaintiffs were offered the opportunity to post collateral.

Thereafter, all plaintiffs except one were offered the opportunity to post $10 collateral and be released. Seventeen of the 28 adult plaintiffs [1] refused to post collateral, because, as some of them testified in substance on deposition, (1) they believed that their arrests were unjustified and that posting collateral would somehow give an air of legitimacy to the arrests; and (2) they held the conviction as a matter of conscience that they could not participate in the bail system which discriminated against persons without sufficient money to "buy" their release.[2]

These plaintiffs complain of a variety of indignities before being released the next morning.

On March 13, 1974, the district court held the arrests were unlawful and that Inspector William Trussell of the Metropolitan Police Department who ordered the arrests was individually liable and that the District of Columbia was liable for the actions of Inspector Trussell.[3] The court accepted Inspector Trussell's subjective good faith in establishing the police lines and ordering dispersal, but on an objective standard found this action unreasonable. Defendants have not contested this ruling on liability. On December 14, 1974, the district court entered its rulings on damages.[4] Plaintiffs sought approximately $775,000 as compensatory damages, identified as: $10,000 per plaintiff for the disruption of the vigil demonstration, $10,000 per plaintiff for the arrest without cause, attendant indignities and four hour incarceration; $10,000 for each of the 17 plaintiffs who refused to post collateral and incurred longer confinement and additional indignities; and lesser amounts for plaintiffs who suffered particular injuries.

The plaintiffs are mostly older, mature individuals.[5] At the hearing on damages, eight plaintiffs testified on a stipulation that their testimony was "typical or representative of the various types of injuries suffered by plaintiffs . . . ." Plaintiffs also sought punitive damages of $100 per plaintiff against Inspector Trussell, and $1000 per plaintiff against the District of Columbia.

The district court awarded $100 damages to each plaintiff, plus an additional $64 to plaintiff Miles Day for loss of wages. It ordered Inspector Trussell to pay $500 damages personally, the rest of damages being awarded against the District of Columbia. It denied punitive damages. On December 12, 1975, the district court held defendant Wilson, formerly Chief of Police, not liable.

## II. COMPENSATORY DAMAGES

The district court concluded that plaintiffs were entitled to only "limited" damages. These three paragraphs are the core of its opinion:

1. There were twenty-nine plaintiffs in the original action who are appellants in this case. Two of the plaintiffs were not parties to the motion for damages. We confine our discussion of damages to the affected twenty-seven plaintiffs.

2. Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Determination of Appropriate Damages at 4.

3. *Tatum v. Morton,* 402 F.Supp. 719, 725 (D.D. C.1974).

4. *Tatum v. Morton,* 386 F.Supp. 1308 (D.D.C. 1974).

5. They are largely from outside Washington, D.C., and came to Washington for a Quaker Worship service and vigil originally sponsored by the Albany Friends Meeting. The two oldest plaintiffs were 68 and 69 years old when arrested. A total of 5 were in their sixties, 12 in their fifties, and 3 in their forties. Only 7 plaintiffs were under 47 years of age. Among plaintiffs were a physician, two Dartmouth professors, a railroad executive, housewives, secretaries, and a kindergarten teacher.

In seeking damages of over $775,000.00, plaintiffs have stressed the importance of their constitutional rights to them, the outrage they felt at having those rights violated, their humiliation in being arrested and briefly incarcerated, and the adverse effect of the publicity attendant to their arrest. The Court does not believe the facts of this case warrant such a massive recovery. Indeed, in fixing damages there are two facts which the Court finds to be controlling in this case. Both of these facts indicate the appropriateness of a limited recovery.

The first of these is that plaintiffs were participating in a demonstration. Their purpose in conducting their prayer vigil publicly in front of the White House rather than privately in a meeting house was to receive publicity. Plaintiffs contend they congregated in response to a newspaper story in which President Nixon had attributed his Vietnam war policy to his Quaker background. These plaintiffs wanted "to hold him in the light" not only to influence him to change his war policy but also to publicly proclaim the Quaker heritage of pacifism. Therefore the publicity incident to their arrest was one of the objectives sought by them. This Court is unable to find that plaintiffs were greatly aggrieved because the light of publicity which they were seeking to have shine on their demonstration shone more brightly than they had anticipated. *Louisiana Sulphur Car. v. Gulf Resources & Chem. Corp.,* 53 F.R.D. 458, 461 (D.Del.1971).

The second fact which the Court finds controlling in this case is that most of the plaintiffs chose not to post collateral and be released from custody when they were given the opportunity to do so. Instead they chose to remain in jail to protest their arrest and the bail system. Despite plaintiffs' protestations of great mental suffering, the reasonable inference the Court draws from their actions is that whatever humiliation and outrage they suffered from the disruption of their vigil and their arrests, it was not so much as to dampen their enthusiasm for demonstrating. The Court does not characterize this opportunity for further witness as a benefit to the plaintiffs. But it does perceive their refusal to post collateral as an indication that their mental distress was not unduly severe. It might be characterized as a sort of self-inflicted mini-martyrdom.[6]

 In our view, the district court's approach was in error in various respects. First, and perhaps foremost, is the conception that the recovery should be "limited" because the plaintiffs were participating in a demonstration. The right to demonstrate is a significant strand of the cluster of First Amendment rights. The vindication of these rights warrants more than token acknowledgment. If men and women come to Washington, D. C. to make a considered protest at the seat of the government, the aborting or impairment of the protest or petition for redress of grievances is a matter of concern to them. At a minimum the monetary importance of this right is indicated by the expenditures they devote to their trip, and their willingness to forego a day of their own time at home, whether at work or in recreation. Compensatory damages embrace more than recompense for monetary injury, however, as is evident from amounts for pain, suffering and humiliation. Compensation for denial of First Amendment rights should not be extravagant, say to the point of awarding the equivalent of what would be a year's, or even six month's compensation for the average person. Correspondingly such a compensation award should not be approached in a niggardly spirit. It is in the public interest that there be a reasonably spacious approach to a fair compensatory award for denial or curtailment of the right to demonstrate. The district court's "limited" approach cannot stand.

The district court continued its analysis by saying that since plaintiff's purpose was to conduct their prayer vigil publicly rather than privately in a meeting house, they in

---

6. *Tatum v. Morton, supra* 386 F.Supp. at 1313.

effect attained their objective by the publicity incident to their arrest. It is one thing to court publicity for a group vigil or meeting, an entirely proper exercise of First Amendment rights. It is quite another to be subject in addition to publicity of an individual arrest.[7] These plaintiffs had duly sought and obtained a National Park Service permit for their demonstration.[8] Their gathering was intended to be peaceful and was peaceful. They did not prevent persons outside their group from joining them, as Inspector Trussell requested. But there was no indication in the record that the persons who joined them were violent in their presence, or that plaintiffs permitted their vigil meeting to be transformed into rowdiness or rout. It may well be, as the district court observed, that their arrest helped them to achieve public awareness of their vigil. However, it cannot be said that they had the objective of an arrest or the publicity of an arrest. Their objective of publicity for a dignified vigil held under authority of a permit is not to be equated with the publicity of arrest for disobedience. Such publicity cannot fairly undercut plaintiff's entitlement to damages for an unreasonable arrest, and we cannot approve such use of concepts of offset or credit for benefits.[9]

We turn to the fact that most of the plaintiffs chose not to post $10 collateral when they were given the opportunity to do so. The district court drew the inference

that their humiliation and outrage from disruption of their vigil and arrests could not have been substantial since they retained a continued "enthusiasm for demonstrating."

Insofar as the refusal of 17 plaintiffs to post collateral was taken as a limitation on the recovery accorded for injuries sustained prior to that action we cannot accept the district court's conclusion. Their willingness to endure further confinement for reasons of principle is in no way a negation of the substantiality of the injuries already suffered. Their stoicism in being willing to suffer more later does not mean that they suffered less previously. Their willingness to suffer in what they deemed a higher cause does not undercut their right to damages for injuries suffered for a reason that has no standing either in their conscience or before the law.

There is some materiality in the district court's reference to the refusal of some plaintiffs to post collateral—especially when the amount involved is as small as $10. It bears on damages for any continuing detention. Yet the district court's per se approach—of imposing an absolute duty to mitigate [10]—was not sound.[11] It is not unreasonable for a plaintiff who has been arrested wholly without cause to insist that the process that is due him must include provision for reasonably prompt review of the situation by responsible persons in the criminal justice system other than the po-

---

**7.** This difference has two aspects, corresponding to the separate injuries suffered by deprivation of First Amendment rights and the false arrests. The latter is altogether absent without an arrest. The arrests infringed on plaintiffs' right to demonstrate beyond cutting it short. Even if publicity for their cause was increased by the arrests, plaintiffs were harmed by the involuntary change in their message. The dispersal and arrests imported into plaintiffs' vigil the specter of disruptiveness and criminal behavior.

**8.** See 36 C.F.R. § 50.19.

**9.** *Louisiana Sulphur,* 53 F.R.D. 458 (D.Del. 1971), cited by the district court, rejected reduction of a contract damage claim in one business, shipleasing, because the wrongful act yielded profits in another, sulphur sales. *Id.* at 461. Damages from impairment of the right to

conduct a peaceful prayer vigil in a place of public prominence cannot be off-set by the publicity of (an unlawful) arrest for resisting (unreasonable) orders to disperse.

**10.** Their failure to take reasonable steps to avoid the consequences of the prolongation of detention makes it inappropriate for this Court to award damages for injuries alleged to have been received by or during the prolongation of detention.

*Tatum v. Morton, supra,* 386 F.Supp. at 1312.

**11.** *Compare Whirl v. Kern,* 407 F.2d 781 (5th Cir.), *cert. denied,* 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969) in which the mitigation principle was recognized but applied in a manner which may fairly be viewed as balancing the fault of the prisoner and the jailer.

lice—by prosecutors in the first instance, and then by judges. In *Sullivan v. Murphy* we referred to the problem presented when bail is "automatically imposed," without any provision for intervening inquiry.[12] And the record of another case stemming from the events of spring, 1971, presents the stark reality of a Justice Department official who insisted on a collateral procedure even as to those for whom there was palpably no probable cause for arrest, hence no possibility of prosecution and no justification for further detention.[13] On the other hand, we cannot blink the possibility of a problem of defendants who may have been subjected to what is later held to be an unlawful arrest but who deliberately presented a challenge to the authorities, and used the device of refusal to post collateral as a means of straining the community's resources.

In the last analysis, we cannot do more than say that the problem is one of reasonableness; there is no absolute rule that a defendant terminates his legal remedy by protesting the bail requirement, and yet the action has some bearing on the money value of the right involved. We can do no more in the end than say the district court had hold of a point that was material yet pushed it too far. The matter calls for more sensitive treatment on remand.

Plaintiffs claim the prolonged detention involved more than mere "indignities". They say that one man was beaten by the police and several women were required to undergo strip searches, in which they had to remove their bras and panties and squat so that their genitals could be examined by a matron. They also allege being kept overnight in such crowded confinement in cells and a corridor that, at some times, there was not even enough room for every one to sit down.

The district court did not specifically consider these allegations, or determine whether such incidents were reasonably foreseeable.

The District of Columbia Metropolitan Police Department has, since these events, issued an order which precludes strip searches unless concealment is suspected, and in any event would have precluded the conduct of strip searches in the manner plaintiffs have alleged—in view of passing policemen.[14] This subsequent change does not obviate the possibility that the strip searches in the absence of any basis for suspicion of concealment of weapons, contraband or evidence was an unforeseeable Fourth Amendment violation independent of the original arrest and decision not to

---

**12.** 156 U.S.App.D.C. 28, 63, 478 F.2d 938, 973, *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973).

**13.** Thousands of people were arrested during May Week, 1971, without field arrest procedures. A meeting was held during this period between Justice Department and police officials at which it was decided to rectify this as far as possible by having the arresting police officers identify individual arrestees. As to the rest of the arrestees, there was no evidence of probable cause for their arrest. Nonetheless, the Assistant Attorney General in charge of the Criminal Division said: "if [the U.S. Attorneys and other prosecutors] were not able to secure adequate police identification at the time they would permit $10 collateral and release the defendant." *Dellums v. Powell,* No. 75–2117 (D.C.Cir. Aug. 4, 1977), Joint Appendix at 2444.

**14.** The special order, dated December 22, 1975, was issued in connection with *Langley v. Washington,* Civ.No. 75–2058 (D.D.C.). On December 23, 1975, Judge Green issued a pre-

liminary injunction prohibiting the District of Columbia from conducting strip searches on parking and traffic arrestees without probable cause to suspect hidden weapons or contraband. The case was settled as to money damages and in light of the search policy order, which read, in pertinent part:

A "strip" search shall be conducted only when the member has reason to suspect that weapons, contraband or evidence are concealed on the person or in the clothing in such a manner that they may not be discovered by employing a full field search technique. Suspicion may be formed on the facts surrounding the crime or arrest, on the basis of information received about the arrestee, or as a result of discoveries during the full field search.

Strip searches shall be conducted in police facilities only under secure conditions affording privacy to the arrestee, by an officer of the same sex as the arrestee, with another member posted outside the search area.

.. 

put up the collateral.[15] We give no explicit direction on the matter but believe the district court should consider the issue afresh in the light of our guidance.

Finally, it is urged that the district court erred in giving loss of pay to only one plaintiff when there are others who also lost their pay. The district court will consider the problem on the remand and act in accordance with just disposition.

## III. OTHER ISSUES

■ We affirm the district court's determination to deny punitive damages, and to deny individual liability in regard to defendant Wilson.

■ The district court was willing to grant the full relief of expungement of plaintiffs' central arrest records, rather than the more limited relief suggested by the city. Plaintiffs now contend that the district court erred, when without explanation, it failed to insert in its order a requested provision declaring that the seizures of plaintiffs shall be deemed not to have been "arrests," as was ordered in *Sullivan v. Murphy*, 380 F.Supp. 867, 869 (D.D.C.1974).[16] No petition for reconsideration was filed. This was likely a happenstance omission. The need for a fully adequate remedy is clear.[17] Counsel for the District indicated at oral argument that it does not seriously object to this full effectuation of the expungement decree.

The case is remanded for further proceedings in accordance with this opinion.

*So ordered.*

WILKEY, Circuit Judge, concurring:

I concur in Judge Leventhal's opinion for the court. My separate observations are directed to three aspects relating to damages which will confront the trial judge on this remand.

1. It is noteworthy that we have not enunciated any precise mathematical standard for the calculation of damages for the First Amendment violation, the interruption of the plaintiffs' vigil in front of the White House. Indeed, there probably is none; at least we have not discovered it. The plaintiffs sought $10,000 each for First Amendment damages, the District Judge awarded $100 each. On remand we leave him to fix the figure somewhere between these two poles.

2. It is difficult to blink the fact that these plaintiffs and the others of their group had a permit for their vigil or demonstration, and therefore they reasonably could expect uninterrupted exercise of their First Amendment rights. The court's opinion takes the position, legally proper I must agree, that it follows that the plaintiffs should not be charged with foreseeing the series of unfortunate incidents which occurred to them.

That is not all the story. True, a group of two hundred responsible mature adults parading peacefully in front of the White House, with the avowed purpose "to hold Richard Nixon in the light," is not likely to incite a riot. And, yet, anyone with a knowledge of crowd psychology and our particular local situation in Washington, D.C., knows that any crowd on the sidewalk

---

15. *See Picha v. Wielgos*, 410 F.Supp. 1214, 1221 (N.D.Ill.1976). *Picha* denied immunity, under *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), to school officials for the search of students for drugs, leaving the question of probable cause to the jury.

16. *Sullivan v. Murphy*, 380 F.Supp. 867, 869 (D.D.C.1974) *on remand* from 156 U.S.App. D.C. 28, 478 F.2d 938, *cert. denied*, 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973).

17. Expungement is an inadequate remedy if, in response to questions on various application forms, one must still classify oneself as having

been "arrested." For this reason, various district judges have accorded declaratory relief classifying unconstitutional seizures as "detentions" rather than "arrests."

In addition to *Sullivan v. Murphy, supra, see Washington Mobilization Committee v. Cullinane*, 400 F.Supp. 186, 218–19 (D.D.C.1975), *aff'd.* (on expungement), No. 75–2010 (D.C.Cir. Apr. 12, 1977); *Roberts v. Wilson*, Civ.No. 1436–71 (D.D.C. Oct. 3, 1974) *affirmed without opinion*, 160 U.S.App.D.C. 149, 489 F.2d 1273 (1976); *Horowitz v. Hene*, Civ.No. 387–71 (D.D.C. Dec. 8, 1972).

at the very gates of the White House is likely to attract other less disciplined demonstrators to join or, indeed, to oppose the purpose of the first group. A group of demonstrators, no matter how well disciplined and intentioned, can serve as an incendiary core, so our experience tells us.

Going further into the practically foreseeable, given the sensitivity of the location involved here, it can be presumed that the police would be equally sensitive and alert to forestall any disturbance affecting the home of the President. (Within the past year an intruder was shot dead on the grounds.) Of course, the District Judge here properly found, looking at the situation objectively and in retrospect, that the inspector in charge reacted too hastily and severely.

Should the plaintiffs, having secured their permit, be charged with foreseeing improper action by the police? Perhaps not, if the issue is so phrased, but putting the matter in reverse, should any group of demonstrators at such a sensitive location ever believe that they have an ironclad guarantee that the police will, in all circumstances which conceivably could arise, act with 100% propriety? If experience, a good part of which is recorded in judicial decisions, is any guide, no such expectation could reasonably be entertained. In truth, on the basis of all human experience, the safe prediction is that the police will make human errors; only the nature and degree is uncertain. So, however firm the legal position of the plaintiffs was after receiving their permit, there were certain risks—foreseeable risks—in the enterprise on which they embarked.

Furthermore, the twenty-seven plaintiffs on this appeal had an opportunity to cut their risks at the time some of these risks were obviously developing, *i. e.,* unlike the great majority of their group of two hundred, they did not accede to Inspector Trussell's request to go across the street into Lafayette Park, an equally public but less sensitive area. I agree that these twenty-seven had a *right* to remain on the White House sidewalk—the First Amendment and

their permit said so—just as they later had a right not to post collateral, but a look ahead at likely consequences in each instance called for a less extreme assertion of those rights at the given time and place. Such a prudential exercise of rights would not in any way have waived their contention that they had a right to be on the White House sidewalk, not in Lafayette Park, and that they had a right to be free from illegal arrest and the concomitant necessity of posting collateral as an alternative to jail.

I suggest that the risks inherent in the plaintiffs' enterprise from the beginning, some of which materialized, and the choices made as events unfolded, have some bearing on the damages to be awarded.

3. Plaintiffs' enterprise was a collective one throughout. The plan to conduct a vigil was carefully coordinated as to personnel involved, the time and place, and the message to be proclaimed. There were no discordant notes, this was not an affair in which each demonstrator was there to do his own thing. The twenty-seven plaintiffs, when asked to move to Lafayette Park, talked it over and decided to remain together on the White House sidewalk. They were collectively arrested and transported to the station house.

We recognize First Amendment rights as individual rights. The violation of First Amendment rights here was, in the usual sense, a violation of each individual's rights. In each instance rights were violated in the same way and in the same degree, which means that the damages awarded to each plaintiff should be exactly the same, as they were for The First Amendment violations here.

The exact equality among the twenty-seven of the violation and the damages to be awarded would not, alone in itself, suggest a collective approach in calculating damages, but the collective nature of the enterprise until the moment of disruption, when the group of two hundred was told to move, does. The plaintiffs had a common objective which was frustrated. Their loss, in a sense, is a collective loss. The measure of damages can, then, be more fairly as-

sessed as collective damages, though recognizing that the rights violated were individual rights.

This approach would provide some guide between the $10,000 and $100 per plaintiff, where the court's opinion leaves the District Judge. We have given no monetary hint as to how much the First Amendment is individually worth in these circumstances, because we have not found that anywhere in the law. Looking at the wrong done as a collective wrong, the total amount awarded against the defendant District of Columbia should be sufficiently sizeable to discourage repetition of such illegal police action in the future, without being of such horrendous size as to shock the public—taxpaying—conscience. The total amount should be sufficient, when divided among the twenty-seven plaintiffs, to give each an amount which will assure him that First Amendment rights are not lightly to be disregarded and that they can be truly vindicated in the courts.

I think such a collective approach to damages would not only vindicate the First Amendment, but would, as a practical matter, tend to preserve its free exercise in the District of Columbia. For if the plaintiffs' claims of $10,000 per demonstrator per police violation are taken as the standard penalty to be assessed against the government, we shall soon—given the inevitable recurrence of large mass demonstrations in the nation's capital—find the Congress (or the City Council) tired of paying the bill for almost equally inevitable police errors, and ultimately banning all demonstrators from the White House area, Lafayette Park, and all other symbolic places, just as the Capitol grounds and other public buildings have already been put off limits to the kind of demonstration which was originally permitted to take place here.